471 So.2d 9 (1985)
Theodore Robert BUNDY, Appellant,
v.
STATE of Florida, Appellee.
No. 59128.
Supreme Court of Florida.
May 9, 1985.
Rehearing Denied July 11, 1985.
*11 J. Victor Africano and Paul E. Risner, Live Oak, for appellant.
Jim Smith, Attorney General and Gregory C. Smith, Asst. Atty. Gen., Tallahassee, for appellee.
ADKINS, Justice.
This is an appeal by Theodore Robert Bundy from his conviction of first-degree murder and from the trial judge's imposition of the death sentence after the jury had recommended death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On February 9, 1978, Kimberly Leach, age 12, was reported missing from her junior high school in Lake City, Florida. Two months later, after a large scale search, the Leach girl's partially decomposed body was located in a wooded area near the Suwanee River, Suwanee County, Florida.
On July 21, 1978, Bundy was indicted for the murder and kidnapping of Kimberly Leach. Trial was set in Suwanee County, Florida. Thereafter, Bundy moved for change of venue or, in the alternative, for abatement of prosecution. The motion for abatement of prosecution was denied. However, the requested venue change was granted and the case transferred to the circuit court in Orange County, Orlando, Florida. There Bundy was convicted of kidnapping and first-degree murder. The jury recommended death. Bundy was subsequently sentenced to a term of life imprisonment for the kidnapping conviction and death for the murder.
The events and evidence leading to the investigation, trial, and conviction of Bundy are as follows: On February 15, 1978, Bundy was arrested in Pensacola, Florida, after fleeing from a stop made by an officer whose suspicions had been aroused. At that time Bundy identified himself to the officer as one Kenneth Misner. Over the next several days Bundy was extensively interviewed by officers from the Pensacola and Tallahassee Police Departments and the Leon County Sheriff's Office. During *12 this time he revealed his true identity. It was learned that Bundy was wanted for escape and homicide in Colorado and was a suspect in thirty-six sex-related murders in the northwest United States. During these interviews and thereafter, Bundy also became the prime suspect in the January 1978 murders of the Chi Omega Sorority members in Tallahassee. Later Bundy was indicted, convicted, and sentenced to death for the Chi Omega murders. We affirmed his convictions and sentences. Bundy v. State, 455 So.2d 330 (Fla. 1984), herein called Bundy v. State I.
Following Bundy's arrest in Pensacola, Detective Parmenter of the Jacksonville Police Department reported to Leon County authorities that on February 8, 1978, his fourteen-year-old daughter had been approached in a shopping center parking lot in Jacksonville by a man driving a white van. The man had fled when the girl's brother arrived. The teenagers were able to record the license tag numbers on the van. The tag had been reported stolen from a Tallahassee residence near the Chi Omega Sorority house on January 13, 1978.
At the suggestion of Leon County authorities, Detective Parmenter agreed to have his children hypnotized. After the hypnotic session, each child was asked to separately make a police composite of the man they had seen on February 8, 1978. These composites were introduced into evidence at trial. Later, during a photo review conducted by the Leon County Sheriff's Department, both Parmenter children picked out the picture of Bundy as the man they confronted on February 8, 1978, with the white van.
On February 11, 1978, Officer Dawes of the Leon County Sheriff's Department was patrolling in an unmarked car in an area of Tallahassee. He observed a man, whom he identified at the trial as Bundy, locking or unlocking a car door. Dawes asked the man for identification and the man replied he had none. Dawes then shined his flashlight into the car and spotted a license tag on the floorboard. The tag number matched the one which had been reported by the Parmenter children. When Dawes went to his car to run a radio check on the tag, the man fled.
Richard Shook, the manager at the Florida State University Media Center, testified at trial that in early February of 1978 a van belonging to the Center disappeared. The van was discovered several days later, taken into custody, and processed for physical evidence. Fingerprints and hair sample comparisons taken could not be linked to Bundy or the victim. Soil samples taken from the van were different from the soil samples taken from the crime scene. Blood stains on the van's carpet were found to be group B blood. The Leach girl had that type as does over fifteen percent of the human population. In addition, analyst Mary Hinson testified that it was extremely probable that both Bundy's and Leach's clothing had come in contact with the van's carpet and that the clothing of each had probably come into contact with each other.
The state offered the testimony of two Lake City Holiday Inn employees and the state's handwriting expert, John McCarthy. These witnesses established that Bundy had registered at the Lake City Holiday Inn on February 8, 1978, under another name.
Prior to Bundy's indictment on July 21, 1978, for the Leach murder and kidnapping, only one witness placed Bundy and the white van at the scene of the Lake City Junior High School on the morning of February 9, 1978. Chuck Edenfield, a school crossing guard at the junior high school, testified that he saw a man whom he identified as Bundy driving a white van in front of the school.
The state's one eyewitness to the abduction of Kimberly Leach was Clarence Anderson. On July 18, 1978, Anderson reported to the Lake City Police Department that the profile of a person he had seen on a television newscast bore a striking resemblance to the man that he had observed with a girl near the Lake City Junior High School several months earlier. Assistant State Attorney Dekle asked Anderson to *13 undergo hypnosis to refresh his memory. Anderson agreed and was hypnotized twice. Thereafter, he stated that on February 9, 1978, he noticed a man leading a young girl into a white van near the Lake City Junior High School. Anderson identified the young girl as Kimberly Leach and the man in the van as Theodore Bundy.
As his first point on appeal Bundy argues that the trial judge erred in denying Bundy's several motions to suppress the testimony of certain witnesses whose recall had been affected or altered by hypnosis. The defense contended that due to the lapse of time between the disappearance of the Leach girl and the revelation of Anderson almost six months later, the massive amount of information about the events that Anderson had ingested during that period of time, and the blatant misuse of hypnosis by those who had facilitated the sessions, a substantial likelihood of an irreparable in-court misidentification of Bundy by Anderson would occur. In his argument before the trial court, Bundy relied on the case of Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In Neil v. Biggers the United States Supreme Court outlined the factors to be considered by the trial court in determining whether an identification was reliable even though the confrontation procedure was suggestive. The Court stated:
[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Id. at 199-200, 93 S.Ct. at 382.
At the time of the suppression hearing in this case, the greater weight of legal authority was that the hypnotizing of a witness went to the credibility of the witness and not to the admissibility of his testimony, but, a number of jurisdictions have recently looked at the use and misuse of hypnosis in the forensic setting and altered this view. In State v. Mack, 292 N.W.2d 764 (Minn. 1980), the Minnesota Supreme Court addressed the issue of the use of hypnotically refreshed testimony as one of first impression. The question certified to the Mack court was whether a previously hypnotized witness may testify in a criminal proceeding concerning the subject matter addressed at the pretrial hypnotic interview. The record before the Mack court contained the opinion of no less than five experts in hypnosis and memory retrieval. The court elected to view the issue as going to the admissibility of the witness' testimony and not its credibility. The court adopted the proposition advanced by the defense that the doubtful reliability of hypnosis prompted recollection raised an admissibility question which should be governed by the standards announced by the District of Columbia Circuit Court of Appeal in Frye v. United States, 293 F. 1013 (D.C. Cir.1923). Under Frye the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate.
In Bundy v. State I, we discussed the Frye test of general scientific acceptance. We noted that recent judicial treatment of hypnosis in connection with the presentation of eyewitness testimony in court reveals a growing recognition that hypnosis is not widely accepted by psychiatrists and psychologists as a consistently reliable method of refreshing or enhancing a person's memory of past perceptions and experiences. Some jurisdictions have held that the testimony of witnesses who have undergone hypnotic memory enhancement is inadmissible per se, either because the technique has not been established as reliable under Frye or because the scientifically recognized danger of unreliability of such testimony outweighs its probative value as a matter of law, or for a combination of such reasons. See, e.g., People v. Shirley, 31 Cal.3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, cert. denied, 458 U.S. 1125, 103 *14 S.Ct. 13, 73 L.Ed.2d 1400 (1982); People v. Gonzales, 415 Mich. 615, 329 N.W.2d 743 (1982). We believe a discussion of the rationale underlying some of these particular decisions is warranted.
In early 1981, the Arizona Supreme Court handed down its decision in State v. Mena, 128 Ariz. 226, 624 P.2d 1274 (1981). The court addressed the rationale of Harding v. State, 5 Md. App. 230, 246 A.2d 302 (1968), cert. denied, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), which was the earliest case deciding the issue of admissibility of testimony offered by witnesses who have undergone hypnosis in an attempt to increase their memories concerning events about which they may testify. The Mena court viewed the Harding court's handling of the issue as cursory. The Mena court stated:
None of the early cases following Harding which approved the admission of testimony from previously hypnotized witnesses contain any analysis of the effects of hypnosis or even acknowledge its power to distort memory... .
Accepting a witness' statement that he is testifying from his own recollection requires the assumption that the witness is capable of making a determination that what he perceives as his recollection actually came from his prior observations as opposed to impressions planted in his memory through hypnosis. Such an assumption is contrary to the opinion held by many authorities that a witness will recall memories fabricated under hypnosis as his own recollection and will be unable to distinguish his true memories from pseudomemories implanted during hypnosis... .
The faith which the above courts placed in the power of cross-examination also seems misplaced. One article claims that "[t]he subsequent opportunity for cross-examination at the trial is virtually ineffective as a means of assuring no false suggestions have been implanted."
128 Ariz. at 230, 624 P.2d at 1278 (citations omitted). The Court of Special Appeals of Maryland in Collins v. State, 52 Md. App. 186, 447 A.2d 1272 (1982), has since overruled Harding and held that the use of hypnosis to restore or refresh the memory of a witness was not shown to be accepted as reliable by the relevant scientific community, and thus such testimony was inadmissible.
In adopting an inadmissible per se rule the Mena court noted:
The determination of the guilt or innocence of an accused should not depend on the unknown consequences of a procedure concededly used for the purpose of changing in some way a witness' memory. Therefore, until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases.
Id. at 231, 624 P.2d at 1279. The court also found that the confrontation clause of the sixth amendment of our Federal Constitution required the exclusion of hypnotically tainted testimony. Id. at 232, 624 P.2d at 1280.
The Arizona Supreme Court again addressed the issue in State ex rel. Collins v. Superior Court, 132 Ariz. 180, 644 P.2d 1266 (1982). In its original opinion the Collins court reaffirmed its decision in Mena. In a supplemental opinion the court modified its original inadmissible per se rule and added the exception that "hypnosis does not render the witness incompetent to testify to those facts demonstrably recalled prior to hypnosis." Id. at 209, 644 P.2d at 1295. The Collins opinion contains most of the relevant excerpts from the scientific community on this subject. These authorities reveal that hypnosis subjects are often so susceptible to suggestion and receptive to the hypnotist's verbal and nonverbal communications that they may respond in accordance with what he or she perceives the desired response to be in order to please the hypnotist. This may even occur in response to implicit stimuli unintentionally *15 emanated from the hypnotist. Another phenomenon which often occurs is the willingness of subjects to confabulate, or "fill in the gaps" in their memories. The following illustrates this situation:
The hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which few, if any, actual memories are available. This situation may jog the subject's memory and produce some increased recall, but it will also cause him to fill in details that are plausible but consist of memories or fantasies from other times. It is extremely difficult to know which aspects of hypnotically aided recall are historically accurate and which aspects have been confabulated... . Subjects will use prior information and cues in an inconsistent and unpredictable fashion; in some instances such information is incorporated in what is confabulated, while in others the hypnotic recall may be virtually unaffected.
State v. Hurd, 86 N.J. 525, 538-539, 432 A.2d 86, 92-93 (1981) (quoting Orne, The Use and Misuse of Hypnosis in Court, 27 Int'l J. Clinical & Experimental Hypnosis 311, 317-318 (Oct. 1979)).
Courts have expressed concern that the recall induced by hypnosis may be totally incorrect, State v. Grier, 129 Ariz. 279, 630 P.2d 575, 578 (App. 1981), and that the subject can willfully lie. Hurd, 86 N.J. at 538, 432 A.2d at 92. In addition, there is the concern that hypnosis is often thought by lay persons to be a magical thing which can produce fantastic recall and startling results. Collins, 132 Ariz. at 186, 644 P.2d at 1272. A greater concern is that the jury is likely to place undue emphasis on what transpired during a hypnotic session. Dilloff, The Admissibility of Hypnotically Influenced Testimony, 4 Ohio N.U.L.Rev. 1, 2 (1977).
The courts of some jurisdictions have held that hypnotically aided testimony is admissible if certain strict safeguards in procedure are followed which are supposed to minimize the recognized danger of unreliability. See, e.g., Hurd; Polk v. State, 48 Md. App. 382, 427 A.2d 1041 (1981). In Hurd, the Supreme Court of New Jersey rejected the rigid Frye rule adopted in Mack and Mena. The court found that "the purpose of using hypnosis is not to obtain truth, as a polygraph or `truth serum' is supposed to do". 86 N.J. at 537, 432 A.2d at 92. It recognized that hypnosis can legitimately be employed as a means of overcoming amnesia and restoring the memory of a witness. The Hurd court stated:
In light of this purpose, hypnosis can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness, which likewise are often historically inaccurate. Based on the evidence submitted at trial, we are satisfied that the use of hypnosis to refresh memory satisfies the Frye standard in certain instances. If it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory.
Id. at 537-38, 432 A.2d at 92.
Having determined that the use of hypnosis to aid a witness met the Frye rule in certain instances, the Hurd court went on to quote elaborately from the testimony of Dr. Orne, one of the defense's experts. Orne's testimony in Hurd and the procedural guidelines which the Hurd court adopted were consistent with the testimony of Bundy's experts, Drs. Kuypers and Kline.
The Hurd court adopted the following rule:
Whenever a party in a criminal trial seeks to introduce a witness who has undergone hypnosis to refresh his memory, the party must inform his opponent of his intention and provide him with the recording of the session and other pertinent material. The trial court will then rule on the admissibility of the testimony either at a pretrial hearing or at a hearing out of the jury's presence. In reviewing the admissibility of hypnotically refreshed testimony, the trial court *16 should evaluate both the kind of memory loss that hypnosis was used to restore and the specific technique employed, based on expert testimony presented by the parties. The object of this review is not to determine whether the proffered testimony is accurate, but instead whether the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory.
Id. at 543, 432 A.2d at 95 (footnote omitted).
The Hurd court went on to elaborate on how the trial court should implement this rule. First, the court should determine whether hypnosis should have been used on the witness in the first place, and, once it is determined whether the witness was one who would yield normal recall with properly administered hypnosis, determine whether the procedures followed were reasonably reliable. Id. at 543-44, 432 A.2d at 95-96. The Hurd court adopted strict procedural safeguards set forth in the Orne affidavit and mandated compliance with these safeguards by the proponent of testimony enhanced by hypnosis. First, an independent psychiatrist or psychologist, not regularly employed by the prosecution or defense, should conduct the interview. Second, any information transmitted to the hypnotist concerning the case must be recorded in some manner. Third, the hypnotist should derive as detailed a statement as possible from the witness prior to induction. Fourth, all meetings between the hypnotist and subject must be recorded. Finally, only the hypnotist and the subject should be present during the hypnotic encounter. The court cast the burden of proof on the proponent of such evidence to establish admissibility by clear and convincing proof.
The Hurd court justified where it was placing the burden by stating:
We recognize that this standard places a heavy burden upon the use of hypnosis for criminal trial purposes. This burden is justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the consequent risk of injustice. Hypnotically refreshed testimony must not be used where it is not reasonably likely to be accurate evidence. The burden of proof we adopt here will assure strict compliance with the procedural guidelines set forth in this opinion. It will also limit the admissibility of this kind of evidence to those cases where a party can convincingly demonstrate that hypnosis was a reasonably reliable means of reviving memory comparable in its accuracy to normal recall.
Id. at 546-47, 432 A.2d at 95 (footnote omitted).
At least two state supreme courts have definitively rejected the analysis espoused in Hurd. In Commonwealth v. Nazarovitch, 496 Pa. 97, 436 A.2d 170 (1981), the Pennsylvania Supreme Court opted to follow the rationale of Mack and Mena. The court stated:
The Hurd court's rationale that hypnotically-refreshed recollection might as well be admissible since ordinary eyewitness accounts are also vulnerable to error and inaccuracies does not do full justice to the fact that "the traditional guarantees of trustworthiness as well as the jury's ability to view the demeanor of the witness are wholly ineffective to reveal distortions of memory induced by the hypnotic process." ... The probative worth of the hypnotically-adduced evidence cannot overcome the serious and fundamental handicaps inherent therein.
.....
While we do not want to establish a per se rule of inadmissibility at this time, we will not permit the introduction of hypnotically-refreshed testimony until we are presented with more conclusive proof than has been offered to date of the reliability of hypnotically-retrieved memory.
Id. at 109-111, 436 A.2d at 177-78.
In Nazarovitch a witness came forward three years after the murder of a twelve-year-old girl and told police she might know something about the murder. Prior to this time, this witness had been questioned *17 on several occasions but had provided no significant information. She was then hypnotized by two state-sponsored hypnotists on four separate occasions and, on the basis of her hypnotically refreshed recollection, Nazarovitch and others were charged with the murder.
The California Supreme Court also rejected the application of the Frye rule as it had been applied in Hurd and opted to follow Mack and Nazarovitch in its decision in People v. Shirley, 31 Cal.3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, cert. denied, 458 U.S. 1125, 103 S.Ct. 13, 73 L.Ed.2d 1400 (1982). The court declined to follow the effort to develop a set of safeguards sufficient to avoid the risks inherent in admitting hypnotically induced testimony, stating that it had not been persuaded that the Hurd requirements would forestall the dangers at which they were directed or address all the dangers of hypnosis involved. Accordingly, the court stated:
[W]e observe that certain dangers of hypnosis are not even addressed by the Hurd requirements: virtually all of those rules are designed to prevent the hypnotist from exploiting the suggestibility of the subject; none will directly avoid the additional risks, recognized elsewhere in Hurd, that the subject (1) will lose his critical judgment and begin to credit "memories" that were formerly viewed as unreliable, (2) will confuse actual recall with confabulation and will be unable to distinguish between the two, and (3) will exhibit an unwarranted confidence in the validity of his ensuing recollection... .
Lastly, even if requirements could be devised that were adequate in theory, we have grave doubts that they could be administered in practice without injecting undue delay and confusion into the judicial process... .
... .
... [W]e join instead a growing number of courts that have abandoned any pretense of devising workable "safeguards" and have simply held that hypnotically induced testimony is so widely viewed as unreliable that it is inadmissible under the Frye test.
31 Cal.3d at 39-40, 641 P.2d at 787, 181 Cal. Rptr. at 255.
In Bundy v. State I, this Court discussed Shirley and also the decision of Brown v. State, 426 So.2d 76 (Fla. 1st DCA 1983), from the Florida First District Court of Appeal in which that court adopted the theory that safeguards could be followed to avoid the recognized dangers of potential improper prejudice. In this Court's Bundy v. State I decision dealing with the Chi Omega murders we were not faced with the issue confronting us in this appeal. We specifically recognized that we were not deciding whether the enhancement of a subject's memory by hypnosis is evidence which must meet the Frye test of general scientific acceptance in order to be admissible. The witness in the Chi Omega case repudiated any independent personal knowledge of the details elicited during the hypnotic trance and the trial judge was satisfied that her trial testimony was based on her own recollection unaffected by the hypnotic experiment. Under those circumstances we held that the fact that the hypnosis took place was a matter relating only to the weight of the testimony and not to its admissibility.
In the present case we are faced with a witness whose memory has been "refreshed" or "enhanced" through state-sponsored hypnosis. Bundy's experts described the numerous inappropriate procedures and questions utilized by the social workers who administered the hypnosis to the witness, C.L. Anderson, in their attempts to enhance Anderson's recall through hypnosis. Both experts also gave their opinion that Anderson should never have been hypnotized in the first place because of the lapse of time between the event he was attempting to remember and the hypnotic episodes and because of all the information he had learned about the event during that intervening period of time. The experts' opinion was that Anderson's testimony was unreliable.
*18 We are swayed by the opinions of the courts of other jurisdictions that have held that the concerns surrounding the reliability of hypnosis warrant a holding that this mechanism, like polygraph and truth serum results, has not been proven sufficiently reliable by experts in the field to justify its validity as competent evidence in a criminal trial. Nor can we agree that employing safeguards has been shown to insure that hypnotically recalled testimony is reliable at the present time. The Michigan Supreme Court recently joined the growing number of jurisdictions that hold that the testimony of a witness whose memory has been refreshed through hypnosis is inadmissible. We feel that court's conclusion in People v. Gonzales, 415 Mich. 615, 329 N.W.2d 743 (1982), aptly describes our view on this issue. The court stated:
Hypnosis has not received sufficient general acceptance in the scientific community to give reasonable assurance that the results produced under even the best of circumstances will be sufficiently reliable to outweigh the risks of abuse and prejudice.
... [U]ntil hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion, or fantasy and until the barriers which hypnosis raises to effective cross-examination are somehow overcome, the testimony of witnesses which has been tainted by hypnosis must be excluded in criminal cases.
Id. at 626-27, 329 N.W.2d at 748. For these reasons, we likewise hold that hypnotically refreshed testimony is per se inadmissible in a criminal trial in this state, but hypnosis does not render a witness incompetent to testify to those facts demonstrably recalled prior to hypnosis.
We must now consider whether the inadmissibility of posthypnotic testimony is to be retrospectively or prospectively applied. The Arizona Supreme Court in Collins thoroughly analyzed this issue and we agree with that court's conclusion that this unforeseen change in the law and the burden that retrospective application would place on the administration of justice and the need for finality in criminal cases support a holding of prospective application only. In Collins the court looked to the criteria established by the United States Supreme Court to guide us in determining when principles should be retroactively applied. This process involves an examination of: 1) the process to be served by the new standard; 2) the extent of the reliance by law enforcement authorities on the old standards; and 3) the effect on the administration of justice of a retroactive application of the new standard. See Brown v. Louisiana, 447 U.S. 323, 328, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159 (1980); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). We have also relied on these essential considerations in our prior decisions. See, e.g., Witt v. State, 387 So.2d 922 (Fla.), cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980). The purpose of our ruling is to exclude from a criminal trial posthypnotic testimony because of its basic unreliability. We do not feel this purpose warrants the reexamination of unknown numbers of jury verdicts. Applying the second criterion we find that the apparent reliance of the police on the use of hypnosis also clearly weighs in favor of the prospective application of our ruling. The police and other law enforcement authorities had no notice that placing persons under hypnosis would preclude their testimony at a subsequent trial. The third criterion to be considered is the effect of retroactive application on the administration of justice. There are obvious practical considerations, in addition to the taxing of trial and appellate courts, in denying retroactive application of our ruling. Only where there is a denial of a basic right of constitutional magnitude that is correctable will retroactive application be applied. This is not the case here.
We hold that any posthypnotic testimony is inadmissible in a criminal case if the hypnotic session took place after this case becomes final. We further hold that any conviction presently in the appeals process *19 in which there was hypnotically refreshed testimony will be examined on a case-by-case basis to determine if there was sufficient evidence, excluding the tainted testimony, to uphold the conviction. We believe this holding balances the competing interests and is the most equitable place to draw the line. Furthermore, we feel certain limitations on the rule should apply. First a previously hypnotized witness is not incompetent in the strict sense of being unable to express himself comprehensibly or understand his duty to tell the truth on his abilities to perceive and to remember. Accordingly, such a witness could testify to all events other than the new matter discovered at the hypnotic session. Second, we do not undertake to foreclose the continued use of hypnosis by the police for purely investigative purposes. Any corroborating evidence obtained is admissible in a criminal trial subject to other evidentiary objections.
We must now determine whether, on the facts of this case, there was sufficient evidence, excluding the hypnotically recalled testimony, to uphold Bundy's conviction. The United States Supreme Court has articulated the harmless-constitutional-error rule to be a question of whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).
The record shows that Mr. Anderson's testimony was refreshed under hypnosis as to only three details. Under hypnosis he was able to recall that the football jersey which the girl he described was wearing was blue and the numbers were "63" or "68." He was also able to remember that part of the man's attire was a pullover sweater and a shirt. After a thorough examination of the record before us in this case, we feel that sufficient evidence does exist, absent the tainted testimony, upon which the jury could have based its conviction of Bundy. There is no reasonable possibility that the tainted testimony complained of might have contributed to the conviction.
The second point that Bundy has raised on this appeal is whether the trial court erred in denying the defense's motion to limit death qualification of the jury. Bundy's argument is novel on this issue in that, in effect, he is urging the non-application of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The substance of his point is that the differences between the Illinois death penalty statute under consideration in Witherspoon and the Florida statute cause Florida's interest in excluding jurors who would automatically vote against the death penalty to be non-existent. Therefore, Bundy urges, his interest in a jury composed of a cross-section of the community controls and the trial court erred in excusing those jurors who were unalterably committed to vote against the death penalty. The state maintains that we are precluded from ruling on this issue since the objections on this ground were never raised in the trial court. We agree. Steinhorst v. State, 412 So.2d 332 (Fla. 1982).
The third point Bundy raises is whether the trial court erred in denying defendant's motion for change of venue or abatement of prosecution. Bundy argues that this inquiry demands an analysis of the collision of first amendment guarantees belonging to the press and the media with his right to have a fair and impartial trial under the fifth and sixth amendments. Accordingly, he argues that the trial court should have granted the defense's motion since it was the least burdensome alternative that would have constitutionally balanced these competing rights. The state's counterargument is that Bundy has failed to specifically direct us to specific portions of the record which require a finding of constitutional unfairness as to the character of the jurors selected. We agree.
The mere existence of extensive pretrial publicity is not enough to raise the presumption of unfairness of a constitutional magnitude. In Murphy v. Florida, *20 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), which dealt with the prosecution of the newsworthy "Murph the Surf" for a breaking and entering charge, the United States Supreme Court recognized that qualified jurors need not be totally ignorant of the facts and issues involved in a case. The mere existence of a preconceived notion as to guilt or innocence is insufficient to rebut the presumption of a prospective jurors' impartiality. It is sufficient if the juror can lay aside his opinion or impression and render a verdict based on the evidence presented in court. Id. at 799-800, 95 S.Ct. at 2035-2036 (quoting Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)). See also Dobbert v. Florida, 432 U.S. 282, 302, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Dobbert v. State, 328 So.2d 433, 440 (Fla. 1976). The record shows that, of the twelve jurors at Bundy's trial, three had no knowledge of the Chi Omega murders. Of those three, two had never even heard of Bundy. Five of the remaining nine had some knowledge of the Chi Omega murders, but they had no more than sketchy ideas of what had occurred. The four remaining jurors did know about Bundy's conviction for the Chi Omega murders. However, all the jurors stated they would put aside any opinion they might hold and decide the case only on the evidence presented. We hold that Bundy has failed to show that he did not receive a fair and impartial trial because the setting or time of his trial was inherently prejudicial. The trial judge committed no error in denying the motion for change of venue or abatement of prosecution.
The fourth point raised is whether the trial court erred in failing to hold a Frye inquiry on its own motion concerning the fiber and shoe track evidence to determine whether the evidence to be presented and the testimony concerning that evidence were both reliable and relevant. Bundy failed to make an objection on this ground in the trial court and he has not demonstrated fundamental error. Therefore, consideration of this point is procedurally barred.
Bundy also raises the issue of whether the trial court erred in denying the defense's motion for a view of the crime site. Such a determination is left to the discretion of the trial judge and there is a presumption as to the correctness of his rulings in the absence of a demonstration to the contrary. Rankin v. State, 143 So.2d 193, 195 (Fla. 1962); Dixon v. State, 143 Fla. 277, 196 So. 604, 605 (1940). Bundy claims that Anderson's recall of the abduction of the Leach girl would be obviously inconceivable had a view of the site been granted by the trial court. Counsel had substantial opportunity, which he exercised, to cross-examine Anderson. In addition, the view had substantially changed from the time of the Leach girl's disappearance in 1978 to the time of Bundy's trial in this cause in 1980. The record shows the road had been widened and fourlaned which would have changed distance evaluation and traffic patterns. Bundy has failed to demonstrate an abuse of discretion by the trial court.
The sixth point raised by Bundy is whether the trial court erred in denying his motion to exclude evidence of flight and the subsequent jury instructions on flight. Bundy argues that the state must be required to prove that the flight was due to the guilty knowledge of the defendant of the crime for which he is on trial beyond a reasonable doubt and to the exclusion of any other explanation for the flight. Unless the state can show that Bundy had no other reason to flee, Bundy argues, the state should not be allowed to introduce evidence of flight.
The probative value of flight evidence as circumstantial evidence of guilt has been analyzed by the Fifth Circuit Court of Appeals as depending upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. United *21 States v. Myers, 550 F.2d 1036, 1049 (5th Cir.1977). These criteria have also been applied by the Eleventh Circuit Court of Appeals in United States v. Borders, 693 F.2d 1318, 1325 (11th Cir.1982), cert. denied, 461 U.S. 905, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983). In Borders the court noted that the cases in which flight evidence has been held inadmissible have contained particular facts which tend to detract from the probative value of such evidence. For instance, the probative value of flight evidence is weakened: 1) if the suspect was unaware at the time of the flight that he was the subject of a criminal investigation for the particular crime charged, United States v. Beahm, 664 F.2d 414, 419-20 (4th Cir.1981); 2) where there were not clear indications that the defendant had in fact fled, Myers, 550 F.2d at 1049-50; or, 3) where there was a significant time delay from the commission of the crime to the time of flight. See, e.g., United States v. Howze, 668 F.2d 322, 324-25 (7th Cir.1982); Myers; United States v. White, 488 F.2d 660, 663 (8th Cir.1973). The interpretation to be gleaned from an act of flight should be made with a sensitivity to the facts of the particular case. Borders, 693 F.2d at 1325.
We see no defects which would render the evidence presented in this case inadmissible. When Bundy was apprehended in Pensacola after fleeing from the officer who had stopped him, it was only six days after the Leach girl had disappeared. The disappearance had attracted much publicity and we feel it is a reasonable inference to make that Bundy fled from the officer as a result of consciousness of guilt on his part for the Leach crime. Likewise, it was two days after the Leach crime when Bundy fled from Officer Dawes after Dawes spotted the license tag on the floorboard of the car which Bundy was apparently using. It is reasonable that a jury could infer such circumstantial evidence to be evidence of guilt. Accordingly, we hold that the two incidents of flight were properly admitted as relevant evidence which a jury could use as circumstantial evidence of guilt. Cf. Mackiewicz v. State, 114 So.2d 684, 689 (Fla. 1959), cert. denied, 362 U.S. 965, 80 S.Ct. 883, 4 L.Ed.2d 879 (1960); Daniels v. State, 108 So.2d 755, 760 (Fla. 1959). The judge's instructions to the jury concerning the evidence of flight was also proper. Proffitt v. State, 315 So.2d 461, 465-66 (Fla. 1975), aff'd, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).
Finally, Bundy challenges the trial court's findings which were relied on in sentencing him to death. Specifically, Bundy challenges the court's finding that the aggravating circumstance enumerated in section 921.141(5)(h), Florida Statutes (1977), existed. That subsection reads:
The capital felony was especially heinous, atrocious or cruel.
The court found the following:
The court finds that the victim was a twelve year old female junior high school student attending the Lake City Junior High School. The Defendant kidnapped her from the said Junior High School sometime between 9 and 10 am on February 9, 1978, and her deteriorated body was found in a hog pen approximately 45 miles from the scene of abduction on April 7, 1978. The victim died of homicidal violence to the neck region of the body. At the time the body was found it was unclothed except for a pullover shirt around the neck. There were semen stains in the crotch of her panties found near the body. Blood was found on the bluejeans also found near her body, and there were tears and rips in some of her clothes. The Court finds this kidnapping was indeed heinous, atrocious and cruel in that it was extremely wicked, shockingly evil, vile and with utter indifference to human life.
This Court explained the language in subsection 921.141(5)(h) in State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile, and cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. *22 Id. at 9. Bundy argues that the absence of proof establishing the cause of Leach's death and the attendant circumstances surrounding it give the court no factual basis which can justify a finding that this aggravating factor exists. We must agree. No specific cause of death could be determined from the autopsy reports. There was no clear evidence offered to show that Kimberly Leach struggled with her abductor, experienced extreme fear and apprehension, or was sexually assaulted before her death. In the absence of these types of facts, we must conclude that this case does not fit in with our previous decisions in which we have found the manner of the killing to be the conscienceless or pitiless type of killing which warrants a finding that the capital felony was especially heinous, atrocious or cruel. See, e.g., Smith v. State, 424 So.2d 726 (Fla. 1982), cert. denied, 462 U.S. 1145, 103 S.Ct. 3129, 77 L.Ed.2d 1379 (1983) (where evidence showed the victim was abducted, confined, and sexually abused by the defendant and then lead into a wooded area and killed execution-style by three shots to the back of her head); Bolender v. State, 422 So.2d 833 (Fla. 1982), cert. denied, 461 U.S. 939, 103 S.Ct. 2111, 77 L.Ed.2d 315 (1983) (defendant methodically held the victims at gunpoint and ordered them to strip and then beat and tortured them throughout an evening before killing them).
Bundy also challenges the trial court's finding that the aggravating circumstances as described in subsections 921.141(5)(a) and 921.141(5)(b) existed. Bundy argues that the findings under these subsections involved the same convicted act and this constituted an impermissible doubling of aggravating circumstances. Section 921.141(5)(a) states:
That the crime for which the defendant is to be sentenced was committed while the defendant was under sentence of imprisonment.
The court's finding read:
The unrefuted testimony established beyond a reasonable doubt that the Defendant was under sentence for aggravated kidnapping in the State of Utah which had not been served, paroled, or pardoned.
Section 921.141(5)(b) states:
The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person.
The court found:
The unrefuted testimony established beyond a reasonable doubt that the Defendant had been convicted of the crime of aggravated kidnapping in the state of Utah and that it was a crime involving the use of, or threat of violence to some person. Further, the Court finds that on July 31, 1979, the Defendant was convicted by the Circuit Court of Dade County, Florida, for the capital felonies of murder of Lisa Levy and of Margaret Bowman (two counts), and of the following felonies involving the threat of violence to some person:
(1) Attempted murder of Karen Chandler;
(2) Attempted murder of Cathy Kleiner;
(3) Attempted murder of Cheryl Thomas; and
(4) burglary of a dwelling with the intent to commit the offense of battery and to commit an [assault] on a person therein, to-wit: Cheryl Thomas.
The state contends that the test enunciated in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) applies. We agree. In State v. Hegstrom, 401 So.2d 1343, 1345 (Fla. 1981), this Court noted that in the absence of a clear contrary legislative intent the Blockburger test must be met before multiple punishments are permissible. Under Blockburger the same act violates two statutes only if each statutory provision requires proof of a fact that the other does not. 284 U.S. at 304, 52 S.Ct. at 182. It is obvious that these two subsections, 921.141(5)(a) and 921.141(5)(b), each require proof of a fact that the other does not. The trial court did not err in finding both aggravating circumstances.
*23 Bundy's next objection is to the trial court's admission of the testimony of an investigator from the district attorney's office in Vail, Colorado, to prove that Bundy had escaped from jail in Colorado. We find no merit to Bundy's argument that this testimony was incompetent and rank hearsay. We find that the testimony offered was competent and sufficient to establish the aggravating circumstance.
We conclude that the trial court correctly found three aggravating circumstances and no mitigating circumstances. We have compared the circumstances found in the present case with those shown in other capital cases.
In Alford v. State, 307 So.2d 433 (Fla. 1975), cert. denied, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976), this Court affirmed the judgment and sentence of the defendant who had raped and murdered a thirteen-year-old girl. The murder of the victim was found to have been committed while the defendant was engaged in the commission of or in flight after committing the life felony of rape of the same victim. The act was found to be especially heinous, atrocious and cruel. The victim had been raped both vaginally and rectally, was blindfolded, and was shot five or six times. No mitigating circumstances were found to exist.
In Martin v. State, 420 So.2d 583 (1982), cert. denied, 460 U.S. 1056, 103 S.Ct. 1508, 75 L.Ed.2d 937 (1983), the defendant, an eighteen-year-old high school dropout, had abducted, committed sexual battery on, and murdered a college student who was temporarily employed in a convenience store. Five aggravating circumstances were found by the trial judge and supported by the record including the findings: 1) that the murder was committed while the defendant was engaged in flight after committing robbery, rape, and kidnapping; 2) that the murder was committed while the defendant was under sentence of imprisonment at the time; and, 3) that the defendant had previously been convicted of felonies involving the use or threat of violence to the person.
In Stevens v. State, 419 So.2d 1058 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983), we affirmed a death sentence where the defendant had robbed a convenience store and then raped, strangled, stabbed, and killed the victim. The trial court properly found four aggravating circumstances including that the murder was committed in the commission of or the flight after committing rape and kidnapping.
After weighing the evidence in this case we conclude that the sentence of death imposed was justified and appropriate under our law. We affirm the judgments of conviction and sentence of death.
It is so ordered.
OVERTON, ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.
BOYD, C.J., concurs specially with an opinion.
BOYD, Chief Justice, concurring specially.
I concur in the affirmance of the convictions and sentence. Because I find that the testimony of the hypnotized witness was based on his independent recollection of the event he saw and was not significantly affected by the hypnosis, I conclude that the testimony was properly admitted. See Bundy v. State, 455 So.2d 330 (Fla. 1984).
Because the eyewitness identification testimony, the crucial link in the chain of circumstantial evidence of appellant's guilt was, as the Court finds, not substantially affected by the use of hypnosis, it is not necessary for us to treat the question of whether testimony derived from hypnotic memory-enhancement techniques is admissible evidence in the courts of Florida.
As the sources discussed in the majority opinion clearly demonstrate, the great weight of legal and scientific authority regards testimony derived from so-called hypnotically refreshed or enhanced memory as highly suspect and unreliable. As scientific understanding of the phenomenon of hypnosis has advanced, the clear trend *24 of judicial decisions is to hold testimony derived from it inadmissible. At the very least, it is clear that such testimony is inadmissible where the hypnotic memory-enhancement procedure is performed without following strict safeguards widely regarded as necessary to the reliability of the technique. Although some degree of care was exercised in this case, the procedure used was not accompanied by safeguards that would be considered adequate under the case law of jurisdictions that recognize the procedure as reliable when safeguards are followed.
Even where hypnotic testimony is regarded as inadmissible or as highly suspect, it has been recognized that testimony based on independent recollection not affected by the attempted hypnotic enhancement can be admissible. See, e.g., State ex rel. Collins v. Superior Court, 132 Ariz. 180, 209-10, 644 P.2d 1266, 1295-96 (1982) (supplemental opinion); People v. Lucas, 107 Misc.2d 231, 435 N.Y.S.2d 461 (Sup.Ct. 1980). I believe this principle applies in the present case.
Rather than decide the case only on the basis of the above-stated principle, the Court now places Florida squarely among the apparently growing number of jurisdictions in which it is held that testimony derived from hypnotically refreshed memory is per se inadmissible in evidence at a criminal trial. Yet at the same time the majority concludes, as I do, that the central or essential substance of the hypnotized witness's testimony was not significantly affected by the improper attempt to enhance memory by hypnosis. Thus it appears to me that the majority's rule of per se inadmissibility is merely an advisory opinion to the courts of Florida because it is not necessary to apply the rule in this case. This observation brings me to my only real objection to the majority opinion and the reason for the writing of this separate opinion.
When a person tried for and convicted of a crime challenges the conviction on appeal on the ground, properly raised at trial, that a crucial and prejudicial item of evidence against him was unreliable evidence and improperly admitted, and the appellate court rules that the evidence was indeed unreliable and prejudicial, then that appellant is entitled to the benefit of the ruling and should be given a new trial. This is so regardless of previous reliance on the old rule or previous ambiguity in the law. Therefore if we were faced with a situation where the crucial identification testimony was actually obtained through improper use of hypnosis, we would be required to reverse the conviction. To apply a new rule of inadmissibility of evidence in a criminal trial prospectively only is highly improper.
To apply such a new rule to the case in which the rule is fashioned and to all cases decided on appeal thereafter is necessary; this does not mean that the rule must necessarily be given retroactive effect upsetting the finality of cases already decided on appeal. I find the majority's treatment of this issue confusing and unnecessary.
We are not required to reverse the convictions here because the testimony in question was not produced by hypnosis. I therefore concur in the affirmance of the convictions. Regarding the appropriateness of the sentence of death, I concur in the majority opinion.