529 So.2d 328 (1988)
Stephen PATE, Appellant,
v.
STATE of Florida, Appellee.
No. 86-2161.
District Court of Appeal of Florida, Second District.
July 29, 1988.
James Marion Moorman, Public Defender, and Stephen Krosschell, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
LEHAN, Judge.
Defendant was convicted and sentenced for sexual battery and kidnapping. He raises five issues on appeal. We reverse and remand for a new trial on the first issue and briefly address the remaining four issues.
Defendant first contends that reversible error was committed when the trial court allowed the state to cross-examine the defendant concerning his giving of a false name and address during a prior D.U.I. arrest, his failure to appear in court on that *329 charge, and a separate sexual battery charge pending against defendant. We agree and reverse for a new trial.
The disputed questions on cross-examination were apparently prompted by two statements made by defendant on direct examination. Those two statements were (1) that he thought at first that the arrest for the current charges concerned his D.U.I. offense and (2) that the reason for his initial refusal to talk to the arresting officer was that the nature of the current charges scared him because he was "not normally accustomed to it." Although defendant did not explain then what it was he was not "normally accustomed" to, on cross-examination he said he meant he was not accustomed to being arrested for a serious crime.
As to the defendant's first statement which concerned his D.U.I. arrest, the state's questions about the arrest and related matters were entirely collateral and had the effect only of showing defendant's bad character. See Fulton v. State, 335 So.2d 280 (Fla. 1976); Finlay v. State, 424 So.2d 967 (Fla. 3d DCA 1983); Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981).
As to defendant's second statement, on cross-examination the state asked defendant whether the current charges represented his first contact with police, whether defendant had been charged with a serious felony before, and whether defendant had twice been convicted, culminating in the questioning about the pending sexual battery charge. This entire line of questioning on the collateral matter of defendant's experience with police was improper. It was error to allow inquiry into defendant's past criminal history other than convictions. See Fulton; Gelabert; Dixon v. State, 426 So.2d 1258 (Fla. 2d DCA 1983); Sneed v. State, 397 So.2d 931 (Fla. 5th DCA 1981); Ragusa v. State, 338 So.2d 1103 (Fla. 4th DCA 1976).
We now respectfully address the position of the dissenting opinion in this case. That position appears to be that the questions on cross-examination were proper attempts to get defendant to contradict his false testimony on direct examination. That opinion does not precisely identify which testimony by defendant is thought to have been false and is therefore thought to have been subject to impeachment. But we assume that that testimony consists of the two statements set out above in the third paragraph of this opinion.
As to the first statement  that defendant thought his current arrest was for his D.U.I. offense  this cannot be said to have been a false statement and did not justify an attempt to impeach that testimony. Nor did the mere mention of the D.U.I. arrest open the door for the state to delve into the matters which followed that arrest, such as the failure to appear and the giving of a false birthdate.
As to the second statement, the state's questions concerning defendant's prior contact with police and prior arrests seemed to be an attempt to impeach the testimony that he was "not normally accustomed to it." But this testimony was so inherently imprecise that it is not susceptible of being called false and, therefore, impeachable. Also, even on the basis that defendant meant he was not normally accustomed to being arrested on serious charges, the statement cannot be said to be false. The two serious charges referred to by the state in its attempt to impeach this statement were the D.U.I. and the other pending sexual battery. However, the record does not conclusively show that the arrest for the other sexual battery occurred prior to the arrest in this case, and we do not conclude that the existence of the D.U.I. arrest rendered false defendant's statement that he was not "normally accustomed" to being arrested on serious charges. Even if we were to conclude (and we do not feel entitled to do so) that the other sexual battery arrest did occur prior to the arrest in this case, we still would not consider the state's questions to have been proper. See Ragusa. In that case, a question on cross-examination accusing defendant of criminal conduct was found to be reversible error and not proper to impeach defendant's prior statement that he was "not in the habit of breaking the law." *330 That prior statement was found not to have opened the door to that cross-examination.
Although, having reversed on the first issue, we need not address the remaining issues, we do so briefly since we are remanding for a new trial. Defendant's second contention is that hypnotically induced testimony was improperly admitted without proper safeguards. Defendant concedes that the prohibition against hypnotically refreshed testimony contained in Bundy v. State, 471 So.2d 9 (Fla. 1985), does not apply because that case stated that that prohibition would apply only to hypnosis sessions conducted after the date of that opinion. The session in this case was conducted prior to that date. Nonetheless, defendant contends that the safeguards contained in Brown v. State, 426 So.2d 76 (Fla. 1st DCA 1983), should apply. We disagree.
This case is similar to the first Bundy case, Bundy v. State, 455 So.2d 330, 339-343 (Fla. 1984), in that this case does not actually involve hypnotically-refreshed testimony. In this case, as in that case, the witness had given a description of the attacker prior to hypnosis, was not shown a picture of defendant before being hypnotized, and identified defendant when shown his picture some time after the hypnosis session. In neither case were significant facts recalled during hypnosis which contributed to the identification of the attacker. Accordingly, we find no error in admitting into evidence the victim's identification of defendant.
We do not address defendant's third issue on appeal concerning the trial court's failure to grant a continuance. That issue is moot in light of our reversal for a new trial.
Defendant's fourth issue raises various asserted errors not objected to below which he contends amount to fundamental error. It is not appropriate for us to anticipate whether there will be any such objections upon retrial or what the ruling of the trial court might be if there are, especially since the law governing these aspects does not appear to require clarification.
Defendant's final issue concerns an alleged error in the calculation of the sentencing guidelines scoresheet, which we need not address.
Reversed and remanded for a new trial.
FRANK, J., concurs.
CAMPBELL, C.J., dissenting with opinion.
CAMPBELL, Chief Judge, dissenting.
I must respectfully dissent in regard to the conclusion of the majority that appellant's conviction should be reversed on the basis of the first issue he raises in this appeal. I do not believe that the questions on cross-examination of the defendant concerning a prior D.U.I. arrest, his failure to appear in court on that charge and a separate sexual battery charge pending against appellant were entirely collateral and had the effect only of showing appellant's bad character.
It seems to me to be beyond dispute that the objected-to testimony elicited on cross-examination was for the permissible express purpose of contradicting appellant's testimony on direct examination and thereby directly attacking his credibility. When done for that purpose, it is immaterial that the elicited testimony is to collateral matters or serves to demonstrate bad character.
Appellant was arrested on the kidnapping and sexual battery charge in Houston, Texas by Detective Allyn of the Hillsborough County Sheriff's Office. Detective Allyn testified that on the plane ride from Houston to Tampa, appellant volunteered information about his reasons for leaving Tampa and going to Houston. Detective Allyn had testified that the investigation of the sexual battery and kidnapping had led to an automobile identified by the victim and traced to appellant. Appellant had been arrested for D.U.I while driving the vehicle which was later identified by the victim.
The automobile and appellant's ownership of it were crucial links in the evidence leading to appellant's conviction. It was his D.U.I. arrest while driving that automobile, the subsequent impoundment of the *331 automobile, and appellant's abandonment of the impounded automobile that directly led to his identification and arrest as the probable perpetrator of the kidnapping and sexual abuse. After appellant was identified as a result of the D.U.I. arrest and his connection with the impounded vehicle, Detective Allyn went to appellant's Hillsborough County apartment and tried, to no avail, to get appellant to answer his repeated knocking on the apartment door. It appears that immediately thereafter appellant left for Texas in a truck.[1]
Appellant was traced to Texas where he was subsequently arrested by Detective Allyn. Detective Allyn testified as follows concerning the conversation that took place with appellant on the plane ride back from Houston:
Q. What about on the plane ride home?
A. On the plane ride home we had just cursory conversation. I was reading a magazine and he made the statement to me, "I recognized you."
And I said, "I beg your pardon." And he said, "I saw you through my peep hole when you came to my apartment." And I said, "You did?" And he went on to say that he had seen me that day and that as soon as I left, he left.
He went on to say that he had not intended to stay in Houston, but the truck had broken down and he had to get a transmission for it. He also related that I had just barely caught him because if he had done what he intended to do he would have left the Country shortly before I arrested him.
When appellant took the stand in an attempt to repudiate the testimony of Detective Allyn, he testified on direct, in pertinent part, as follows:
Q. And then Detective Allyn came to see you?
A. Yes, he did.
Q. And you didn't want to talk to him at that time?
A. No, I didn't.
Q. Was there a reason for that?
A. Well, just the nature of the charges scared me, for one thing. You know, I'm not normally accustomed to it, and I just, you know, didn't want to say anything to him. I wanted to talk to a lawyer before I said anything to anybody.
... .
Q. Now, you heard his testimony about what you said about him catching you?
A. It was no [sic] catching me. I was a bartender in Spats and I lived there. I had a residence and, you know, next thing I know I was arrested. I figured that it was for my DWI, but I didn't realize the seriousness of the charge until after they informed me.

Q. Now, you heard him say that you told him that he just almost missed you because you were going to leave?
A. Yeah, I heard him say that.
Q. Is that what you told him?
A. No, I did not.
Q. What did you tell him?
A. I didn't say anything to him in concern with me leaving. He didn't even ask me any questions. He just asked me if I wanted to talk to him and I told him that I wanted to talk to an attorney.
Q. I'm talking about on the plane. You heard earlier today something to the effect that you told him on the plane trip that you said that he was lucky to catch you because you were going to leave the Country?

A. I never said that.

Q. You never said that?

A. No, I never did.

(Emphasis added.)
On cross-examination, appellant was questioned as follows about leaving Tampa and his subsequent arrest and conduct in Houston:
Q. Where did you go?
A. Well, I had left that day.

*332 Q. You never came back.
A. Pardon.
Q. You never came back.
A. Yes, I did.
Q. They had the house under surveillance?
A. I came back. I had my stuff together and I was going to go out to Texas.
... .
Q. You left in your brother's truck?
A. No, it's my truck. It's a company, but it was more mine. It was more mine than my brother's.
Q. What happened to your blue Nova?
A. It was impounded.

Q. And you never picked it up, did you?
A. I sold it to a gentlemen [sic] for a motorcycle.
Q. You said it was impounded. Did you take it out of the impound?
A. No, I did not. It was part of the deal that he can have the car.
Q. So, you never went to pick up your car after you were arrested for DWI?

A. No.
Q. And you thought  when you were arrested in Houston initially you thought it was for DUI?

A. When they first arrested me that's what I thought it was for.
Q. You didn't appear in court when you were arrested for the DUI?
A. No, I didn't.
Q. And in fact you gave a wrong birth date to the officer?
A. I beg your pardon.
... .
Q. You gave the date of December 4th, '57. Is that your correct date of birth?
A. No, it was not.
Q. Your correct date is January 30, '56?
A. Yes, it was.
... .
Q. You made the comment that you felt awkward talking to the police because you're normally not accustomed to talking to police?

A. I did make that statement.

Q. You did?
A. Yes.
Q. Why would you feel so awkward talking to police? Is this your first contact with police?

A. In this capacity, yes, sir.

Q. What do you mean this capacity?

A. I mean being charged with a serious crime like this.

Q. You're telling us that you've never been charged with a serious crime?
A. No, I'm not saying that. I'm just saying, I mean, I'm not used to being arrested and put in jail for this type of charge.

Q. You're telling this Jury that you were concerned because you've never been accused of a serious felony before?

A. Yes, sir.

... .
Q. You haven't been arrested?
A. No.
Q. Is that what you're telling us?
A. Well, for the DWI.
Q. That's the only time?
A. For being arrested?
Q. Uh-huh.
A. That's about it.
Q. What about the sexual battery in St. Petersburg, did you forget about that?

A. Sir, that was three years ago and 
Q. But you're still pending charges there.
MR. ALBRECHTA: I'm going to object to this, Your Honor.

THE COURT: Approach the bench.
(Thereupon, the following conference was at bench.)
MR. ALBRECHTA: Your Honor, counsel is bringing in evidence that is improper for this Court to bring before the Jury for one reason only and, that is to prejudice the Jury against my client, and I would ask that it be stricken and curative instructions given.

*333 MR. VALENTI: Well, he opened the door.
MR. ALBRECHTA: If that isn't given, I ask for a mistrial.
THE COURT: Deny the motion, but I agree that he opened the door, but limit your questions.
MR. VALENTI: Yes, sir.
(Thereupon, the bench conference was concluded.)
BY MR. VALENTI:
Q. But you have been charged with other serious felonies before?
A. Yes, I have.
Q. So you were mistaken or lying when you said that you weren't before?
A. I just told you that I was scared, sir. That's all that I said.
Q. And you're telling us that when the detective went to arrest you in Houston that he was making up those stories about telling him that you were going to be long gone and that you were planning on leaving the Country?
A. I never made those statements, sir.
Q. And when you left your apartment on March the 3rd are you telling us that you returned again, or you can't remember because it's been so long ago?
A. Sir, on March the 3rd 
Q. When the detective went to your house.
A. I never knew there was a detective came to my house.
Q. So, he lied about that too, that you were looking through the peep hole and saw him?
A. I never said that.
Q. That's what I'm saying, the detective was lying again?
A. I never said that to him.
Q. Right?
A. Right.
Q. So, the detective was lying when he took the stand and under oath said that you told him that?
A. He must have been mistaken, sir.
(Emphasis supplied.)
The cases cited in the majority opinion do not pertain to the situation where the defendant's testimony on direct examination is sought to be contradicted on cross-examination and his credibility thereby directly attacked. The cases relied upon by the majority all deal with either (1) a direct assault by the state on a defendant's character so as to impeach him indirectly or (2) a solicitation of testimony about the previous criminal record of the defendant so as to indirectly impeach his character and thereby his credibility solely on the basis of the prior record. Neither of those two situations is present here. In this case, the state made a direct attack on the appellant's credibility, not his character, by showing through cross-examination that he testified falsely on direct examination. It just so happened that the purported false testimony on direct examination were statements about his previous arrest experiences. In this case, it is not the prior record regarding either the D.U.I. or the sexual battery charge that is impeaching. It is the purported false testimony appellant volunteered in his own direct testimony about those matters that gave rise to the state's attempt to get appellant to contradict on cross-examination what he had testified to on direct examination.
It is proper on cross-examination to show bias, prejudice, interest and motive of a witness. Hair v. State, 428 So.2d 760 (Fla. 3d DCA 1983). To show that a defendant has testified falsely to his own advantage on direct examination is an important and prevailing use of cross-examination. In fact, one of the overriding purposes of cross-examination is to weaken or discredit testimony given on direct examination. Coco v. State, 62 So.2d 892 (Fla. 1953), cert. denied, 349 U.S. 931, 75 S.Ct. 774, 99 L.Ed. 1261 (1955); Frost v. State, 104 So.2d 77 (Fla. 2d DCA 1958). Section 90.608, Florida Statutes (1985) permits the impeachment of a witness by evidence in contradiction of his testimony in chief. See Ehrhardt, Florida Evidence, 2d ed. § 608.5 Impeachment  Contradiction. In my opinion, the right to impeach by contradictory testimony elicited on cross-examination is well established.
Where the defendant in a criminal case testifies as a witness, his veracity and *334 credibility may be tested by cross-examination as other witnesses may be tested. The accused may be cross-examined for the purpose of impeaching his testimony, for his credibility is in issue when he offers himself as a witness, and this is true regardless of the rule adopted in regard to his cross-examination as to matters not covered by his direct examination. A defendant testifying in his case to facts indicating his innocence cannot by omissions in his testimony limit questions addressed to credibility in cross-examination to admissions related to those precise facts.
(Emphasis supplied.) 81 Am.Jur.2d Witnesses § 524, p. 528 (1976) (footnotes omitted).
On the issue of credibility, a jury should be entitled to hear whether a defendant who takes the stand in his own behalf has testified falsely as to any matters solicited in behalf of his defense in his direct testimony and to use that knowledge in weighing the overall credibility of the defendant.
I would affirm.
NOTES
[1] The state was careful not to elicit from the state's witnesses any evidence of the fact that appellant had been stopped and arrested for D.U.I. until after the appellant testified to that fact in his own behalf.