752 So.2d 545 (1999)
Berry KESSLER, Appellant,
v.
STATE of Florida, Appellee.
No. 90,035.
Supreme Court of Florida.
November 18, 1999.
*546 James Marion Moorman, Public Defender, and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Candance M. Sabella, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Berry Kessler. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse the conviction because the trial court failed to allow adequate screening of prospective jurors concerning pretrial publicity.
Berry Kessler and John Deroo established Custom Craft Cabinetry, a cabinet manufacturing shop, in Hudson, Florida, in 1990. A year later, on February 3, 1991, Deroo's body was found in the shop by Kessler and two friends. He had been shot six times in the face. Based on evidence uncovered in subsequent years, Kessler was indicted for first-degree murder in May 1994. Evidence at trial showed the following: Kessler had purchased a $500,000 "key man" life insurance policy on Deroo in March 1990, and then just weeks before the murder had tried to increase its value to $1,000,000; after Deroo's death, when Kessler was told that Deroo had not kept up the payments on the policy, Kessler exclaimed, "Oh my god" (Kessler had been sending Deroo funds to pay the premiums); Kessler subsequently initiated a scheme to set up another corporation (XTC Leather and Lace), hire a figurehead ("Bo" Yankee), insure him for up to $1,000,000 as a "key man," and then murder him; this latter scheme was infiltrated by the FBI and in the course of this plot Kessler made many inculpatory remarks concerning the Deroo murder, which were recorded by the FBI.[1]
Kessler was tried for the Deroo murder, and the FBI tapes were introduced at trial. He was convicted as charged. The trial court pursuant to the jury's nine-to-three vote sentenced him to death based *547 on two aggravating circumstances,[2] two statutory mitigating circumstances,[3] and several nonstatutory mitigating circumstances.[4] Kessler raises six issues on appeal,[5] but we find a single claim dispositive.
Prior to trial, Kessler on September 6, 1996, filed with the court a three-page "Motion for Individual and Sequestered Voir Dire," stating in part:
The defendant, by and through undersigned counsel, respectfully moves this Honorable Court to order that prospective jurors in this cause be questioned in voir dire individually and out of the hearing of other prospective jurors, for the purpose of discerning their ... knowledge of the case based upon pre-trial publicity and asserts the following grounds in support of his motion:
A. In order to obtain a fair and impartial jury, it is absolutely essential to inquire of each prospective juror about his knowledge of the offense, the parties and the witnesses. It is necessary to inquire what the veniremen's knowledge is and to ask questions to determine how that knowledge will affect his deliberations.
1. By explaining what he or she has heard about the charges or what he or she knows about parties or witnesses, a venireman may very likely impart his knowledge to the other prospective jurors unless there is individual, sequestered voir dire. Such knowledge, which is often based on opinion, rumors, hearsay, media coverage and other sources of inadmissible evidence, can taint the entire venire that is exposed to it and serve to deny the Defendant a fair trial by an impartial jury.
2. Whenever there is believed to be a significant possibility that individual jurors will be ineligible to serve because of exposure voir dire shall take place outside the presence of other chosen and prospective jurors.
. . . .
D. To deny this motion it to deny the Defendant his right to a fair trial by an impartial jury comprised of a representative cross-section of the community, in violation of Amends. V, VI and XIV, United States Constitution and Art. I, Sect. 2, 9, 16 and 22, Florida Constitution.
(Citations omitted.) The court denied the motion and instead required prospective jurors to complete a brief (i.e., three-question) *548 form asking if they were familiar in any way with the named individuals or charged crimes.[6] The court made no provision for private follow-up questioning of jurors who responded affirmatively to the general questions on the form. During voir dire, defense counsel renewed his request for individual and sequestered questioning, and the court again denied the request.[7]
On the morning of the second day of voir dire, Tuesday, December 10, 1996, the St. Petersburg Times newspaper published on the front page of its Pasco County edition an article concerning the trial. The title read: "Murder-for-hire trial starts today." The subtitle stated: "The state is pursuing charges against a defendant who has already been convicted in federal court of killing a Hudson cabinet-maker." The caption below a picture of Kessler read: "Berry Kessler is serving a life sentence with no possibility of parole." The text of the article stated in part:
The trial is unusual for a number or reasons, chief among them that Kessler already has been convicted in federal court in the killing of Hudson cabinet-maker John Deroo and an Ohio businessman. Kessler is serving a life sentence in prison with no possibility of parole.
. . . .
He was arrested two years [after the killing of Deroo] and convicted of trying to arrange a second hit on another business partner, who was involved in a pornography shop with Kessler in Columbus, Ohio.
At the time, Columbus police said Kessler had been a suspect in at least five other slayings of business associates. The cases have never been solved.
T. Christian Miller, Murder-for-Hire Trial Starts Today, Pasco Times, St. Petersburg Times, Dec. 10, 1997, at 1B.
Prior to commencement of voir dire that day, defense counsel asked the court to poll the venire concerning the newspaper article, and the court refused:
MR. EBLE (defense counsel): Would the Court please ask if [prospective jurors] *549 read the St. Pete Times, or the Court would let us ask them if they're Times readers?
THE COURT: I'm not inclined to do that, because that simply brings up specificity, which only goes backI think the standard questionnaire covers it, so your request is denied.
During the subsequent voir dire, the following discussions took place with venireperson Mengel:
THE COURT: ... Mr. Mengel, do you feel that you can put aside anything that you may have read or heard about this case and serve with an open mind and reach a verdict based only on the law and the evidence presented during the course of the trial?
THE COURT: Yes, sir.
. . . .
THE COURT: All right. Thank you, sir. Mr. Mengel, is your knowledge concerning this charge based upon firsthand knowledge, that is, something you actually saw or heard, or upon secondhand knowledge?
PROSPECTIVE JUROR MENGEL: Newspaper this morning.
THE COURT: All right. Do you feel you could set asideI believe we have already discussed that you feel you could set aside that and render your verdict based upon the evidence and the law in this case.
PROSPECTIVE JUROR MENGEL: Yes.
. . . .
MR. MENSH (prosecutor): ... So if you have read or heard something on the outside, whether it was in the morning or yesterday or before, you can assure Judge Webb that you will put that out of your mind and only consider the facts and testimony from the witness stand, coupled with the law that Judge Webb tells you that applies to them. Will you do that?
PROSPECTIVE JUROR MENGEL: Yes.
MR. MENSH: Mr. Mengel, you indicated that you read something maybe this morning. Without going into it, would you be able to do that, put that aside?
PROSPECTIVE JUROR MENGEL: Yes, sir.
. . . .
MR. EBLE (defense counsel): ... Mr. Mengel, you also read the newspaper, so I'm going to ask you the same questions. Was it today's St. Pete Times?
PROSPECTIVE JUROR MENGEL: Pasco Times.
MR. EBLE: And without telling me what the opinion was, if you formed one, but did you read the article all the way through?
PROSPECTIVE JUROR MENGEL: Yes.
MR. EBLE: When you read the article, did you form an opinion as to the guilt or innocence of Mr. Kessler? Without telling me what, did you form and opinion at the time you read the article?
PROSPECTIVE JUROR MENGEL: I didn't form an opinion me personally, but I assumed that somebody else had formed an opinion and found him guilty. I'm sorry.
MR. EBLE: But
PROSPECTIVE JUROR MENGEL: But I didn't form an opinion.
MR. EBLE: Have you not formed an opinion as you sit here today?
PROSPECTIVE JUROR MENGEL: No.
MR. EBLE: Do you presume Mr. Kessler innocent of the charges against him?
PROSPECTIVE JUROR MENGEL: Yes.
MR. EBLE: You can assure Mr. Kessler and myself, if you are selected, that you presume him innocent as we sit here?

*550 PROSPECTIVE JUROR MENGEL: Yes.
. . . .
MR. EBLE: Mr. Mengel, I have the same question of you, sir. Mr. Kessler's entered a plea of not guilty to the charges in this Indictment that he effected the death of John DeRoo from a premeditated design. Will you hold the State to that burden if selected as a juror?
PROSPECTIVE JUROR MENGEL: Yes, sir.
After defense counsel exhausted his peremptory challenges, he asked that Mengel be excused for cause. The court denied the request and also denied defense counsel's request for an additional peremptory challenge to strike Mengel, who ultimately sat on the jury.
Kessler now contends that the court erred in failing to excuse Mengel for cause. The State, on the other hand, points out that Mengel said he could put aside any adverse publicity and render an impartial verdict. The State argues that the court ruled properly pursuant to Castro v. State, 644 So.2d 987 (Fla.1994), and Bundy v. State, 471 So.2d 9 (Fla.1985). We disagree.
The trial court standard for granting an excusal for cause is based on reasonable doubt: "The juror should be excused if there is any reasonable doubt about the juror's ability to render an impartial verdict." Turner v. State, 645 So.2d 444, 447 (Fla.1994). A trial court's ruling on an excusal for cause will be sustained on appeal absent an abuse of discretion. Castro v. State, 644 So.2d 987, 990 (Fla.1994). Discretion is abused "only where no reasonable man [or woman] would take the view adopted by the trial court." Huff v. State, 569 So.2d 1247, 1249 (Fla.1990).
We addressed a similar pretrial publicity issue in two recent casesboth arising in Pasco Countywherein we reversed the capital convictions because the court refused to allow individual and sequestered voir dire. See Bolin v. State, 736 So.2d 1160 (Fla.1999); Boggs v. State, 667 So.2d 765 (Fla.1996). In Bolin, we addressed this issue at length:
[W]e hold that the preferred approach for Florida trial courts is to conduct individual and sequestered voir dire of prospective jurors whenever, as in Boggs, "the timing and content" of pretrial publicity creates the probability that prospective jurors have been exposed to prejudicial information that will not be admissible at trial. Clearly, the timing of the newspaper articles at issue in this case, which were published two days before and the day of the voir dire examination, was such that the information would be fresh in the minds of venirepersons who had read the articles. Just as clearly, the content of the articles stating that the defendant had been convicted in a prior trial of this same murder, that he had been convicted in another prior trial of murdering two Hillsborough County women, and that he had been sentenced to death was prejudicial and inadmissible information. These articles also contained information about Bolin's former wife's testimony as to Bolin's confession to her, which was the very information this Court had found to be erroneously admitted at Bolin's prior trial. This Court had found harmful error in the admission of this same evidence and had reversed the conviction and remanded for the instant retrial below. Exposure to this information might not require disqualification of prospective jurors if this information were going to be introduced into evidence. However, all of the foregoing information had been excluded from this trial on evidentiary grounds. Moreover, the entire jury venire likely would have been tainted by knowledge of all of this inadmissible evidence if the trial judge or counsel had questioned prospective jurors in the presence of other venirepersons *551 regarding exposure to pretrial publicity.
We further comment on this issue to provide guidance to trial judges when confronted with pretrial publicity in cases in which the death penalty is sought. Such publicity is normal in cases with extreme public interest, and we continue to adhere to our holding that the decision as to individual and sequestered voir dire is a discretionary decision for the trial judge. However, as a caveat, we advise trial courts that they must consider the timing and content of the published information in making the decision as to whether to conduct individual and sequestered voir dire. Trial courts must ascertain whether prospective jurors possess information which is not admissible in the trial in which they will serve as jurors and which is so prejudicial to the defendant that the jurors' knowledge of the information creates doubt as to whether the jurors can decide the case based solely upon the evidence that will be admitted at trial.
Bolin, 736 So.2d at 1165-66 (citations omitted).
In the present case, we note the following: (1) The newspaper article in the St. Petersburg Times was published on the second day of voir dire and thus was fresh in jurors' minds; (2) the information contained in the article was extraordinarily prejudicial (i.e., the article stated that Kessler had already been convicted in federal court of the present crime, that he was serving a life sentence without possibility of parole in federal prison for the present crime, that he additionally had been convicted of trying to arrange a second contract murder of another businessman, and that he was a suspect in at least five other unsolved murders of business associates); (3) much of the above information (except the details of the plot to kill a second businessman) was inadmissible in the present trial; and (4) juror Mengel read the article in its entirety.
As in both Bolin and Boggs, the circuit court in the present case denied the defense request for individual and sequestered voir dire. This prevented defense counsel from developing an accurate picture of the impact of the article on juror Mengel, for had counsel attempted to do so the information would have been broadcast to the entire venire. Defense counsel, for instance, was unable to gauge the following: Whether Mengel had focused closely on the article when he read it; whether he had understood and absorbed the details of the article; whether he had found the article credible; and whether he had experienced a gut-level reaction to the article.
The State contends that it is enough that Mengel averred that he possessed an open mind and could render a fair verdict based solely on the evidence presented at trial. We disagree. We addressed a similar situation in Reilly v. State, 557 So.2d 1365 (Fla.1990), wherein we concluded that it would be unrealistic to believe that a prospective juror could unring this bell:
The problem is that juror Blackwell knew that a confession had been given. This might not require disqualification if the confession were going to be introduced into evidence. Here, however, the confession had been suppressed. Thus, juror Blackwell was aware of a fact that was inadmissible which was for more damaging to Reilly than anything which was actually introduced into evidence. While Mr. Blackwell subsequently gave the right answers with respect to whether or not he could be an impartial juror, it is unrealistic to believe that during the course of deliberations he could have entirely disregarded his knowledge of the confession no matter how hard he tried. Thus, we conclude that reversible error was committed by the failure to excuse juror Blackwell for cause. *552 Reilly, 557 So.2d at 1367.[8] Based on our decisions in Reilly, Boggs, and Bolin we reiterate the following: When a prospective juror has been recently exposed to pretrial media reports containing highly damaging inadmissible information (such as that in the present case), the preferred practice is to permit individual and sequestered voir dire to determine the extent of juror bias.
The case cited for support by the State, Bundy v. State, 471 So.2d 9 (Fla.1985), is inapplicable to the present case. This Court in Bundy was confronted with the issue of whether the trial court erred in denying the defendant's motion for change of venue. Several of the venirepersons who ultimately were seated on the jury knew of Bundy's convictions for prior murders but had stated they would put that knowledge aside. This Court affirmed the denial of the motion, ruling as follows:
The mere existence of extensive pretrial publicity is not enough to raise the presumption of unfairness of a constitutional magnitude.... The mere existence of a preconceived notion as to guilt or innocence is insufficient to rebut the presumption of a prospective jurors' impartiality. It is sufficient if the juror can lay aside his opinion or impression and render a verdict based on the evidence presented in court.... We hold that Bundy has failed to show that he did not receive a fair and impartial trial because the setting or time of his trial was inherently prejudicial.
Bundy, 471 So.2d at 19-20. Our ruling in Bundy was in the context of a motion for change of venuenot a dismissal for cause. We were deciding in that case whether the trial should have been held elsewherei.e., whether an entire community should have been summarily excused for cause, so to speaknot whether an individual juror should have been excused. The practical and policy considerations underlying these two issues are vastly different. The above language, which properly states the law vis-a-vis change of venue, cannot be lifted out of context and applied to the present case to trump recent decisions of this Court that are directly on point.[9]
Based on the foregoing, we conclude that without individual and sequestered voir dire the trial court in the present case did not have before it sufficient information on which to conclude beyond a reasonable doubt that juror Mengel could render an impartial verdict. Accordingly, the trial court abused its discretion in refusing to dismiss Mengel for cause. As in two other recent Pasco County casesBolin and Boggswe must reverse this conviction because the trial court failed to allow adequate screening of jurors concerning pretrial publicity.[10]
We reverse the conviction, vacate the death sentence, and remand for a new trial.[11]
It is so ordered.
*553 HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Prior to trial on the state charges, Kessler was charged with and convicted of numerous federal crimes arising from the Deroo murder, including interstate conspiracy to commit murder. He was sentenced to life in prison on the federal charges.
[2] The court found that the murder was committed in a cold, calculated, and premeditated manner and was committed for pecuniary gain.
[3] The court found the following: the defendant's age (he was sixty-nine years old at the time of the murder, and seventy-five at the time of sentencing); and the defendant's lack of a prior significant criminal record. The court gave "slight weight" to each factor.
[4] The court found the following: the defendant would not be a danger to society as a septuagenarian in prison; the defendant served and was decorated in World War II; the defendant was married to the same woman for fifty years (although he had been cheating on her for years); he had raised four children; he is Jewish, attended temple, and was generous to the children at the synagogue; he was generous in his business (although evidence showed he was "a clever, cunning, and deceitful wheeler-dealer who was consistently attempting to separate victims from their assets"); he was gainfully employed but was under financial and emotional stress; he behaved himself at trial; he can be productive in prison (although he "plotted and planned while in jail awaiting trial to have key witnesses against him killed"); and his prior convictions were for nonviolent offenses. The court gave slight weight to most of these factors.
[5] Kessler claims that the trial court erred on the following points: (1) in denying his for cause challenge of juror Mengel; (2) in admitting his statements to FBI informant Barkett; (3) in allowing evidence of other bad acts to become a feature of this trial; (4) in admitting evidence of his income tax convictions; (5) in admitting evidence that he showed no sympathy when told of Deroo's death; (6) in denying a mistrial after the prosecutor and witnesses made comments concerning his federal convictions.
[6] The text of the questionnaire read in full:

1. Are you familiar with any of the individual(s) whose name(s) are set forth in this questionnaire? If yes, please state the individual(s) with whom you are familiar.
2. Have you read or heard anything about any of the above-named individual(s) or the charges alleged against the above named defendant? ___ yes ___ no. If your answer is "yes" please answer question number 3 below.
3. If your answer to question 2 was "yes", do you: (mark appropriate answer) ___ a. feel that you can put aside anything that you have read or heard about this case and serve with an open mind and reach a verdict based only on the law and evidence presented during the trial?
or
___ b. feel that, as a result of what you have read or heard about this case, you will not be able to serve with an open mind and render an impartial decision based only on the law and the evidence presented at trial?
[7] The following discussion transpired at voir dire:

MR. EBLE (defense counsel): I'm going to renew our request for individual voir dire as far as pretrial publicity based on the Boggs decision and also the practical matter on behalf of Mr. Kessler, the Defendant, cannot make an educated decision as to whether to strike these people for cause or peremptorily based on information that I'm unaware of. Just ask them if you know something and can you be fair. We need to know what they know so we can make an objective decision as to whether they're being truthful to themselves or not as to any other matters that we ask them questions about. We may not expect it to take their answers as gospel, it's obvious that two of these jurors have read the newspaper article which goes into the federal conviction and the potential of admissions made by the defendant. Perhaps I could give the Court a copy of the newspaper article as an exhibit at this time in support of our motion.
THE COURT: ... And the motion for individual voir dire is denied. I've had a chance to read Boggs. I appreciate you getting me a copy. But I remember it differently as opposed to the way [defense counsel] remembers it. So you may proceed.
[8] See also Singer v. State, 109 So.2d 7, 24 (Fla.1959) ("[Knowledge of inadmissible information] cannot be erased from the mind as chalk is erased from a blackboard.").
[9] The State's reliance on Castro v. State, 644 So.2d 987 (Fla.1994), is similarly misplaced. There, unlike the present case, individual voir dire was conducted to determine the effect of pretrial publicity.
[10] We note that our decision in Boggs, which is directly on point, had been issued months before voir dire took place in either Bolin or the present case. Although defense counsel for Kessler brought Boggs to the attention of the trial court during voir dire, the court rejected our decision as inapposite. Both Bolin and the present case were tried by the same circuit court judge in Pasco County.
[11] To assist the court on retrial, we address the remaining issues as follows. (2) The FBI did not violate Kessler's right to counsel by obtaining inculpatory statements through the use of informant Barkettat the time the statements were made, Kessler was not undergoing custodial interrogation nor had he been charged with the present crime. See Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (3) Evidence of other crimes was not improperly made a feature of the present trialthe probative value of the evidence outweighed its prejudicial impact. See Consalvo v. State, 697 So.2d 805 (Fla.1996); Heath v. State, 648 So.2d 660 (Fla.1994); Wuornos v. State, 644 So.2d 1000 (Fla.1994). (4) The court erred in admitting further evidence of Kessler's tax convictionsthe evidence was irrelevant to any material fact in issue in the present case. See Czubak v. State, 570 So.2d 925 (Fla.1990). (5) The court erred in admitting evidence of Kessler's lack of remorse any probative value was outweighed by the prejudicial effect. See Randolph v. State, 562 So.2d 331 (Fla.1990). (6) The court did not abuse its discretion in responding to witness statements referring to the federal proceedingthe references were isolated and inadvertent. See Merck v. State, 664 So.2d 939 (Fla.1995).