DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2014*

**DALIA DIPPOLITO,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D11-2628

[July 30, 2014]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Jeffrey Colbath, Judge; L.T. Case No. 2009CF009771AXX.

Andrew B. Greenlee, Robert L. Sirianni, Jr. and Michael M. Brownlee of Brownstone, P.A., Winter Park, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and John M. Klawikofsky, Assistant Attorney General, Tampa, for appellee.

WARNER, J.

Dalia Dippolito appeals her conviction for solicitation to commit first degree murder with a firearm. She argues the trial court erred by denying her request to individually question prospective jurors about their exposure to pretrial publicity about her case, and by denying her request to strike the entire jury venire after all the jurors heard an allegation that appellant had attempted to poison the victim in this case. We agree and reverse. We affirm as to the remaining issues without further comment, as they were either not error or not properly preserved.

***Background***

In the late summer of 2009, appellant's lover approached the Boynton Beach Police Department and reported that appellant was planning to kill her husband. An investigation ensued, during which police videotaped incriminating meetings between appellant and her lover, as well as between appellant and a purported hit man, who was in reality an

undercover officer. The hit man agreed to shoot and kill appellant's husband in their home and make the killing look like part of a burglary.

Subsequently, police staged a fake crime scene at appellant's home and informed her that her husband had been killed in the manner described by the hit man. Appellant's reaction was videotaped by the police and by the television show "Cops," which was then filming the Boynton Beach Police Department. Appellant was subsequently taken to the police station and interviewed. The police eventually told appellant that her husband was alive and revealed the hit man was an undercover officer. Appellant maintained her innocence.

She was charged with solicitation to commit first degree murder with a firearm. The case generated considerable pretrial publicity. She pled not guilty, and a ten-day jury trial was held in late April and early May of 2011.

Prior to trial, on March 30, 2011, appellant moved to individually question prospective jurors about their exposure to pretrial publicity. Appellant alleged the case had "received a great deal of national attention and publicity and has been reported on a variety of national media shows[.]" She alleged that, due to unspecified public comments by her husband's divorce attorneys, she had sought a gag order in the parties' divorce proceedings in late August 2010. She also reported that the Boynton Beach Police Department had uploaded to YouTube the videos of appellant taken during the investigation. She tallied the number of views the videos had received to date and alleged they had been "played nationally, locally on the internet and on nationally produced television shows[.]" These included the Today Show, Good Morning America, CNN, and CBS News. The trial court denied the motion but noted appellant could re-raise the issue at jury selection.

Appellant renewed her motion on the first day of jury selection. Her counsel asserted several new newspaper articles had appeared in the prior forty-eight hours, which had "liken[ed] this case or compare[d] it to Scott Peterson or Martha Stewart or Michael Jackson," and had "impl[ied] that this is some sort of slam dunk by the State[.]" The court again denied the motion, but noted questioning might "evolve into individual voir dire" depending on "[the] venire's knowledge of the case[.]"

The court read prospective jurors a brief description of the charges, which had been agreed upon by the parties, and asked jurors for a show of hands as to who had heard of the case. Many indicated they had: the court commented there were "a lot of hands," and appellant's later motion for new trial alleged that twenty-eight of the fifty-four prospective jurors

2

raised their hands.  The court asked whether any juror had "some strong feelings that would be difficult to overcome and give either the State a fair trial or the Defense a fair trial."  No hands were raised.

When it was appellant's turn to question the jurors, she again requested individual voir dire, concerned that asking individual jurors about the media reports could lead to contamination of the entire jury pool.  The court commented that none of the jurors "held any strongly held opinions on the merits of the case" and opined, "I don't think it's necessary for you to say, hey, tell me everything you heard about this case. . . . [T]hat's going to lead to more problems than it's going to solve."  Appellant argued she had the right to ask jurors what, specifically, they had heard about the case, and the court eventually agreed she could do so.  However, the court ruled it would "[n]ot yet" allow individual questioning.

As appellant proceeded to question the jurors about their knowledge of the case, the jurors freely recounted what they had heard and seen on the news.  One juror mentioned "an allegation that [appellant] had tried to poison her husband with antifreeze.  That was in the Palm Beach Post." The trial court had already ruled that allegation inadmissible at trial.[1] Therefore, appellant moved to strike the jury panel and for a mistrial.  The court denied both requests.

The case proceeded to trial, after which the appellant was convicted of attempted first degree murder with a firearm.  The court sentenced her to twenty years in prison.  She then filed this appeal.

### *Refusal To Conduct Individual Voir Dire and To Strike Jury Panel*

Appellant claims that the court erred in refusing individual voir dire and in failing to strike the jury panel after it had heard inadmissible bad acts evidence from one of the jurors.  This is dispositive of the appeal.  We conclude that the court erred in refusing to allow individual voir dire questioning and in failing to strike the jury pool.

The denial of a motion to strike the jury panel is reviewed for an abuse of discretion.  *Williams v. Osking*, 105 So. 3d 653, 655 (Fla. 4th DCA 2013). Likewise, "a trial court has broad discretion in deciding whether

---

[1] Contrary to the state's assertion on appeal, the state had not merely agreed to refrain from introducing this evidence; the trial court had ruled it inadmissible in a pretrial order dated April 20, 2011.

prospective jurors must be questioned individually about publicity the case has received." *Bolin v. State*, 736 So. 2d 1160, 1164 (Fla. 1999).

Three Florida Supreme Court cases control the disposition of this case: *Boggs v. State*, 667 So. 2d 765 (Fla. 1996), *Bolin v. State*, 736 So. 2d 1160 (Fla. 1999), and *Kessler v. State*, 752 So. 2d 545 (Fla. 1999). In *Boggs* and *Bolin*, the defendants' initial convictions and death sentences were reversed and, just before jury selection in the retrial, local newspapers published inadmissible and prejudicial information about the first trial. *Boggs*, 667 So. 2d at 766; *Bolin*, 736 So. 2d at 1161-63. Similarly, in *Kessler*, on the day of jury selection a newspaper article published inadmissible and prejudicial information about the defendant's federal conviction for the same crime and stated he was being investigated for unsolved murders. 752 So. 2d at 551.

In *Boggs*, the court held,

[B]ecause of the timing and content of the newspaper articles and the statements made by these prospective jurors that they had read newspaper articles and had formed opinions about the case, individual voir dire examination of these prospective jurors was compelled. Through individual voir dire, the trial court could have determined the extent of the prospective jurors' knowledge of the newspaper articles and evaluated whether their preformed opinions could be set aside. This procedure would have also protected the remainder of the venire from any potential contamination resulting from this questioning. . . . [W]e find that the trial court abused its discretion by not allowing further individual inquiry of the two prospective jurors who could not unequivocally state that they could not set aside their preformed opinion as to Boggs' guilt and base a verdict solely on the evidence presented . . . .

667 So. 2d at 768. *Bolin* appears to expand on *Boggs*, holding that even where the jurors had not formed opinions based upon media reports, individual voir dire was still required:

Even though these jurors, unlike the challenged prospective jurors in *Boggs*, stated during voir dire that they had formed no opinions as to Bolin's guilt, there was no individual voir dire with specific questions concerning the jurors' knowledge of newspaper articles containing inadmissible and prejudicial information. Thus, defense counsel, the trial judge, and this

4

> Court are left to speculate about what these jurors had learned from these newspaper accounts.
>
> In *Reilly v. State*, 557 So. 2d 1365 (Fla.1990), we found the same type of publicity concerning inadmissible information to be so prejudicial that even a prospective juror *without* a preformed opinion should not be allowed to serve on a jury after exposure to the publicity. *Id.* at 1367.

*Bolin*, 736 So. 2d at 1164-65.

Relying on a federal case which held that "simply asking members of the jury venire to indicate by a show of hands whether the publicity would impair their ability to render an impartial decision did not adequately protect the defendant's constitutional rights," *Bolin* held, "the preferred approach for Florida trial courts is to conduct individual and sequestered voir dire of prospective jurors whenever, as in *Boggs*, 'the timing and content' of pretrial publicity creates the probability that prospective jurors have been exposed to prejudicial information that will not be admissible at trial." *Id.* at 1165 (relying on *Cummings v. Dugger*, 862 F.2d 1504, 1507-08 (11th Cir. 1989)). However, the court noted that exposure to prejudicial information "might not require disqualification of prospective jurors if this information were going to be introduced into evidence." *Id.* at 1165.

In *Kessler*, one venire member admitted having read the prejudicial article about the defendant in its entirety, and sat on the jury after Kessler's for-cause challenge was denied. 752 So. 2d at 550. Even though this juror had stated during questioning that he had not formed an opinion and could be fair, the supreme court found that the denial of individual voir dire

> prevented defense counsel from developing an accurate picture of the impact of the article on juror Mengel, for had counsel attempted to do so the information would have been broadcast to the entire venire. Defense counsel, for instance, was unable to gauge the following: Whether Mengel had focused closely on the article when he read it; whether he had understood and absorbed the details of the article; whether he had found the article credible; and whether he had experienced a gut-level reaction to the article.
>
> The State contends that it is enough that Mengel averred that he possessed an open mind and could render a fair verdict based solely on the evidence presented at trial. We disagree.

5

*Id.* at 551. Although *Boggs* had noted that exposure to pretrial publicity was not enough, in and of itself, to raise a presumption of unfairness, citing *Bundy v. State*, 471 So. 2d 9 (Fla. 1985), *Kessler* distinguished *Bundy* as addressing "a motion for change of venue–*not* a dismissal [of a juror] for cause" and found "[t]he practical and policy considerations underlying these two issues are vastly different." *Kessler*, 752 So. 2d at 552.

In sum, *Bolin* and *Kessler* hold that, where inadmissible and prejudicial information about the case has recently been published in the media, the trial court abuses its discretion if it does not permit individual voir dire of jurors exposed to such publicity. *Bolin*, 736 So. 2d at 1165; *Kessler*, 752 So. 2d at 552. They hold there is an abuse of discretion even if the venire members exposed to the publicity testify, per a show of hands, that they have not formed an opinion and can be impartial. *Bolin*, 736 So. 2d at 1164-65; *Kessler*, 752 So. 2d at 550-52. Thus, the state's argument in this case that there was no abuse of discretion because no juror who had formed an opinion sat on the jury is without merit.

Under the *Boggs/Bolin/Kessler* standard, while the trial court may not have abused its discretion in denying the pretrial request for individual voir dire, it did abuse its discretion in denying the appellant's later, renewed request for individual voir dire to determine each juror's knowledge of the media reports. Further, the court abused its discretion in denying the motion to strike the panel when a juror revealed inadmissible prior bad acts of appellant.

The pretrial motion requesting individual voir dire cited to media reports which appeared to have aired more than six months before the motion was filed. Although appellant later complained of more recent stories, she failed to specifically identify, in either her written pretrial motion or her renewed motion prior to questioning the jurors, any prejudicial, inadmissible information that had been reported in the media. *See Kessler*, 752 So. 2d at 551 (individual voir dire should have been allowed where article appearing on second day of voir dire stated the defendant was serving a federal sentence for the same crime); *Bolin*, 736 So. 2d at 1162-63 (individual voir dire should have been allowed in retrial where multiple articles published within a few days of jury selection recounted inadmissible information from the defendant's first trial for the offense). Because the media reports were not recent and did not, as described by appellant, convey inadmissible evidence, individual voir dire was not mandated from the start.

6

Moreover, much of the evidence contained in the media reports would later be admitted as evidence at trial. The YouTube videos of appellant were admissible and, indeed, were later played at trial. Thus, exposure to these videos would not necessarily have required disqualification of prospective jurors. *See id.* (exposure to prejudicial information "might not require disqualification of prospective jurors if this information were going to be introduced into evidence"). When individually questioned, jurors who indicated they could not be fair because they had seen the videos were stricken and did not sit on the jury. Appellant failed to identify any other prejudicial information to which prospective jurors could have been exposed. She mainly objected to the tone of the media coverage, which she believed implied her guilt. On this record, we cannot say the trial court abused its discretion by denying the motion for individual, sequestered voir dire prior to jury selection.

However, this trial shows why individual voir dire should have been conducted once it became apparent that a multitude of prospective jurors had been exposed to pretrial publicity. Appellant had the right to ask these jurors what specific information they had learned from the media; the jurors' show of hands was insufficient to protect her right to a fair and impartial jury. *See Bolin,* 736 So. 2d at 1164-65; *Kessler,* 752 So. 2d at 551-52. The trial court's refusal to allow appellant to do so on an individual basis posed the danger that one juror's response could taint the entire panel. This is, in fact, what occurred when one juror mentioned the poisoning allegation. We thus find that the trial court abused its discretion when appellant renewed her request to individually voir dire the jurors on the media coverage during her counsel's opportunity to question the jurors. *See Bolin,* 736 So. 2d at 551; *Kessler,* 752 So. 2d at 1164-65.

The trial court then erred by failing to strike the jury panel after all the jurors had heard the poisoning allegation. Because it involved an attempt to kill the same victim, it was closely related to the pending charges and could have prejudiced jurors in rendering their verdict. Even though appellant had not been formally charged with a crime based on the alleged poisoning, we find the comment analogous to comments informing prospective jurors of a defendant's criminal history, other pending charges, or arrests. *See Evans v. State,* 36 So. 3d 185, 186 (Fla. 4th DCA 2010); *Holt v. State,* 987 So. 2d 237, 239 (Fla. 1st DCA 2008); *Wilding v. State,* 427 So. 2d 1069, 1069 (Fla. 2d DCA 1983).

The state argues any error was harmless "[i]n light of the video evidence of Appellant soliciting the undercover officer to kill her husband[.]" Yet the harmless error test "does not re-weigh the sufficiency of the evidence but focuses on how the error affects the trier of fact." *Holt,* 987 So. 2d at 240.

7

Here, we cannot conclude that this error was harmless beyond a reasonable doubt "because of the possibility that jurors were unfairly prejudiced by their knowledge" of this closely related allegation. *Id.* (finding error was not harmless because "[j]urors could have assumed that because Appellant was charged with another robbery, he was the perpetrator of the robbery being tried as well"); *see also Jackson v. State*, 729 So. 2d 947, 951 (Fla. 1st DCA 1998) (finding error was not harmless "because of the possibility that the jury panel was unfairly prejudiced by virtue of their knowledge of his arrest for other crimes"). We note that, if this type of evidence had been improperly introduced at trial, it would have been presumed harmful. *See Kopsho v. State*, 84 So. 3d 204, 212 (Fla.), *cert denied*, 133 S. Ct. 190 (2012). Accordingly, appellant was deprived of an impartial jury, and we reverse appellant's conviction and remand for a new trial.

*Reversed and remanded for a new trial.*

DAMOORGIAN, C.J., and MAY, J., concur.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***

8