Gerber, J.
The defendant in a criminal case seeks certiorari review of the trial court’s order prohibiting all attorneys in the case from making extrajudicial statements until the jury is sworn for the defendant’s third trial. The defendant argues the court’s order departs from the essential requirements of law in three respects: (1) the State made no evidentiary showing that any threat to a fair trial was imminent and substantial; (2) the order is an overbroad prohibition of political speech and the court failed to consider less restrictive alternatives like individual voir dire and striking of tainted jurors; and (3) the court’s selective enforcement of the order amounts to viewpoint discrimination. We deny the petition, because the court’s well-reasoned order does not depart from the essential requirements of the law. The order demonstrates that extrajudicial statements pose an imminent and substantial threat to a fair trial; is narrowly tailored in both substance and duration; and is viewpoint neutral as it applies to extrajudicial comments by both parties’ counsel.
We present this opinion in six parts:
1) the procedural history;
2) the parties’ arguments to the trial court;
3) the trial court’s order and post-order proceedings;
4) the parties’ arguments to this court;
5) our standard of review; and
6) our analysis of the defendant’s three arguments.

1. Procedural History

The defendant is charged with solicitation to commit first-degree murder with a firearm. The State alleges that the defendant hired a hitman to kill her then husband. The purported hitman was actually an undercover officer from the Boynton Beach Police Department. See Dippolito v. State, 143 So.3d 1080, 1081 (Fla. 4th DCA 2014).
In 2009, the Boynton Beach Police Department arrested the defendant and pub *235 lished video of the defendant talking to the purported hitman. Other footage showed the defendant reacting to a staged crime scene at her house and to the false news that her husband had been killed. These videos were uploaded to the police department’s YouTube page, and they also aired on an episode of the national TV show COPS. Id. As this court previously noted, “[t]he case generated considerable pretrial publicity.” Id. at 1081-82. The videos posted by the Boynton Beach Police Department were replayed and shown on national TV shows including the Today show, Good Morning America, and others. Id. at 1082.
In 2011, at the defendant’s first trial, her theory of defense was that she believed she was auditioning for a TV show and therefore was acting during the events shown on video. At jury selection, many prospective jurors indicated they previously heard of the case by raising their hands. Id. It later was alleged that 28 of the 54 prospective jurors had raised their hands. Id. After a ten-day trial, the jury found the defendant guilty as charged. On appeal, we reversed, concluding the defendant was deprived of an impartial jury. Id. at 1086. Specifically, we concluded the trial court erred by denying the defendant’s request “to individually , voir dire the jurors on the media coverage” of the case. Id. at 1085. We also found the trial court erred by failing to strike the jury panel after one prospective juror openly discussed an allegation that the defendant had attempted to poison the victim—an allegation not charged in the case. Id.
In December 2016, at the defendant’s second trial, she claimed police misconduct and asserted an objective entrapment defense. During jury selection, a large number of the 200-person jury panel indicated they previously heard something about the case. 'While conducting voir dife, the defense filed three separate motions for a change of venue, asserting that the defendant could not receive a fair trial due to pervasive local media coverage of the case. The defendant specifically cited the police department’s YouTube videos relating to the case. The trial court denied the motions to change venue, reasoning that, at the same time defense counsel was complaining about media • attention, he was commenting about the case on his Twitter account. The second trial ended with the trial court declaring a mistrial due to a hung jury.
In January 2017, following the mistrial, defendant’s two defense attorneys issued a press release. Defense counsel said the prosecution against the defendant was “politically motivated” and came at a significant “price tag”’ for taxpayers. Defense counsel also asserted that, even if the defendant “did the crime,” she already had “done the time” by completing nearly eight years of house arrest.

2. The Parties’ Arguments to the Trial Court

Following issuance of defense counsels’ press release, the State filed a motion for protective order to prevent extrajudicial comments by defense counsel. In the same motion, the State sought the revocation of the lead defense attorney’s pro hac vice status. The State alleged that “[rjeeent statements by defense counsel indicate they are intentionally trying to improperly influence the local jury pool” before the defendant’s third trial, which is scheduled for June 2, 2017. The State specifically cited defense counsels’ press release. The State also referred to the lead defense attorney’s “prior pattern and past tactics” of attempting to influence potential jurors. In support of its motion, the State cited Rule 4-3.6(a) of the Rules Regulating the Florida Bar which provides:
A lawyer shall not make an extrajudicial statement that a reasonable person *236 would expect to be disseminated .by means of public communication if the lawyer knows, or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that proceeding.
The defendant filed a response arguing that the State was attempting to “impair her attorneys’ First Amendment right to free speech.” The defendant» further argued the State was improperly influencing the jury pool to have a negative view of her by releasing, through the Boynton Beach Police Department, videos relating to her case. The defendant further noted that the prosecutor from her first trial had written a book about the case called, “Poison Candy: The Murderous Madam: Inside Dalia Dippolito’s Plot to- Kill.” Although the book was released after the prosecutor left her job at the State Attorney’s Office, it was published while the defendant’s first appeal was pending, and the former prosecutor is now counsel for the alleged victim in this case. The defendant further argued that defense counsel issued their press release following the mistrial only as a way to counter the State’s own press release, which indicated the defendant would be tried for a third time. The defendant maintained that the “few stray comments” by defense counsel “do not pose a substantial or imminent threat to a fair trial” and did not support a gag order.
The State filed a reply clarifying that it sought a gag order which would apply to “all counsel, including the prosecutors,” and an order that would require counsel “to refrain from extrajudicial comments to the media until the case has been tried to a verdict.”
The trial court held a hearing on the State’s motion for protective order. At the hearing, the defendant argued the State failed to show that defense counsels’ press release violated Rule 4-3.6(a). The defendant also contended that the State’s proposed gag order was a prior restraint on speech, was .not narrowly tailored, and was “not substantiated by the sort of evidentia-ry support that would require the Court to issue a gag order.” According to the defendant, the State failed to show there was any risk-that prospective jurors would be tainted by counsel’s extrajudicial statements. .
The trial court asked the State what evidence it had that extrajudicial statements threatened a fair trial. The State cited: the January 2017 press release from defense counsel; an unspecified number of press conferences held by defense counsel during the prior trials; and critical comments defense counsel leveled at the trial court in February 2016, which resulted in the trial court’s sua sponte issuance of an order to show, cause and its • consideration of whether to revoke defense counsel’s pro hac vice status.. The State added:
All day long, every day [defense counsel] left this Courtroom and'his goal was [to] get on TV so that [he could] influence this jury. That was his goal. Every day demeaning our witnesses, demeaning the Boynton Beach Police Department; Absolutely. That is evidence the Court should consider.
The trial court took the matter under advisement, stating it needed time to draft a detailed order.

3. The Trial Court’s Order and Post-Order Proceedings

The trial court entered a. well-detailed written order granting the State’s motion for protective order but denying the request to revoke defense counsel’s pro hac vice status.
*237 The trial court began by finding that, after defense counsel was retained in 2015, he “conducted numerous scheduled press conferences to discuss this case and the defense’s version of the facts.” The trial court further found that, after defense counsel, in early 2016, filed his motion to dismiss based on entrapment, he “conducted regular press conferences discussing his view of the facts,” and “emphasized the defense theory that the police manufactured the alleged crime for the sake of an appearance on COPS.” In support of this finding, the trial court cited the order to show cause which it issued in response to defense counsel’s press conference leveled at the trial court. The trial court explained that, in the prior order, it found defense counsel “violated Bar Rule 4—8.2(a) by making a statement concerning the integrity of the Court that he knows to be false ... and also violated Bar Rule 4-3.6(a) by making an extrajudicial statement that he knows, or reasonably should know, will have a substantial likelihood of materially prejudicing” the case.'
The trial court proceeded to explain that, during jury selection for the second trial in December 2016, “[sjeventy percent of the 200 jurors summoned for the trial had heard something about the case.” The trial court noted that the defendant moved three times in jury selection for a change in venue “asserting that she could not receive a fair trial because of pervasive media coverage.” According to the trial court, at the same time defense. counsel was expressing concerns about media coverage, he “was commenting about the case on a [Tjwitter account.”
The trial court found that, after the second trial resulted in a mistrial, “[defense counsel] again conducted a press conference to discuss the case.” The trial court asserted that defense counsel “continued to discuss the tactics and motivations of the Boynton Beach Police Department and commented on the spiritual nature of the Defendant and her family.”
The trial court lastly referred to defense counsels’ January 2017 press release, in which they claimed the prosecution was politically motivated and a waste of money.
Based on the foregoing history, the trial court concluded:
The evidence, and the record, in this ease support a finding that continued unfettered- extrajudicial statements pose a substantial and imminent- threat to a fair trial-. Jury selection is scheduled to commence on June 2, 2017. The Defendant has chosen to proceed .to trial with jurors from Palm Beach County. Potential jurors in Palm Beach County have already been exposed to extraordinary and pervasive media coverage of .this case.
[[Image here]]
The extrajudicial statements made by the' Defendant’s attorneys in this case, whether intended or not, are likely to bias potential jurors by repeated exposure to matters which are completely collateral to this case. The numerous press conferences conducted by [defense counsel] have directly, or indirectly, suggested that this casé is a referendum on the police. While certainly the specific actions of the Boynton Beach Police Department are an issue in this case, this case is not a referendum on the police in general, nor .-can any juror lawfully decide[ ] this case to send a message to law enforcement. .
Statements made recently by defense counsel concerning the Defendant “having served her time” and concerning the State Attorney’s Office similarly place collateral matters into the public forum in this publicity charged case. No juror can lawfully consider any of these matters.
*238 [[Image here]]
In most cases, commentary on collateral matters, or on the case itself, would not pose an imminent threat to a fair trial. However, as already discussed, the level of media coverage of this case has been, and continues to be, extraordinary. Every statement made by anyone connected with this case is being reported and re-reported. Speculation runs rampant on irrelevant issues in this case such as when did the Defendant have a child while on house arrest. In a case that has already been tried twice in this county, and in a case exposed to such pervasive media coverage, the impact on potential jurors of continued extrajudicial statements by the attorneys in this case poses a real and imminent threat to the orderly administration of justice and to a fair trial.
(footnote omitted).
As a result, the trial court prohibited “[a]ll counsel in this case ... from making any extrajudicial statement” reasonably expected to be publicly disseminated which specifically related to the following:
a. The evidence in this case or any party’s view or opinion of the evidence in this case;
b. The facts of the case or any party’s interpretation of the facts of the case, including any inferences that could be drawn from the facts;
c. The motive or motivation of the State in prosecuting the case or the motive or motivation of the Defendant in pursuing any theory of defense;
d. Sentencing or punishment of the Defendant including any reference to the sentence imposed after the first trial, the Defendant’s score on the Criminal Punishment Code Scoresheet, length of in-house arrest or punishment of the Defendant if found guilty;
e. Theories of the case by the State or the Defendant;
f. The first or second trial of this case, including the results of those trials; and
g. The disparagement of any attorney of record in this case.
Notwithstanding the topics prohibited by the preceding list, the trial court explained that attorneys were allowed to comment “generally on the progress of the case, procedural matters or rulings of the ■Court, provided the comments are consistent with the Florida Rules of Professional Conduct.” The trial court further provided that its order would “automatically expire upon the swearing of a jury.”
Following entry of the trial court’s order, but before filing the instant petition, the defendant filed two motions asking the trial court to hold the State in contempt for violating the order. In the first motion, the defendant claimed the State ran afoul of the order by allowing the Boynton Beach Police Department, as the State’s agent, to keep videos relating to her case on the department’s YouTube page. The defendant argued that although no new videos had been posted, allowing the videos to remain online despite the gag order would constitute “viewpoint discrimination.” In the second motion, the defendant addressed media reports, citing a “source close to the case,” that the alleged victim would testify in the upcoming trial, as he did in the first trial. The defendant asserted that this “source” had to be one of the current prosecutors or the former prosecutor who now was counsel for the alleged victim.
The trial court conducted a hearing and clarified that its order applied to counsel only. The trial court further noted that its order did not require “anyone to go back *239 and remove anything from the public domain, nor could I.” Although the trial court denied the requested relief, the court stated that if it saw “someone doing indirectly what they can’t do directly, I will take action, and you can bring it to my attention.”

⅛. The Parties’ Arguments to This Court

a. The Defendant’s Arguments

The defendant argues that the trial court’s order departs from the essential requirements of law in three respects: (1) the State made no evidentiary showing that any threat to a fair trial was imminent and substantial; (2) the order is an over-broad prohibition of political speech and the trial court failed to consider less restrictive alternatives like individual voir dire and striking of tainted jurors; and (3) the trial court’s selective enforcement of the order amounts to viewpoint discrimination.
On the defendant’s first argument, she contends that the only evidence which the State submitted was defense counsels’ January 2017 press release. According to the defendant, because the press release was issued more than four months before the currently scheduled trial date and because the State did not show that any media outlet published the press release, the State failed to establish an imminent and substantial threat to a fair trial. The defendant further contends that, to the extent the State referenced defense counsel’s other comments and press conferences, such references were presented as argument, not evidence, and do not support the trial court’s order. In support, the defendant relies on E.I. Du Pont de Nemours & Co. v. Aguamar, S.A., 33 So.3d 839, 841 (Fla. 4th DCA 2010) (“[A] gag order should be supported by evidence .... ”), and Rodriguez ex rel. Posso-Rodnguez v. Feinstein, 734 So.2d 1162, 1164 (Fla. 3d DCA 1999) (finding there was no showing gag order was necessary where “[n]o evidence other than the newspaper advertisement itself was presented to the court.”).
On the defendant’s second argument, she contends that the trial court’s order is not narrowly tailored to preclude only prejudicial statements made by counsel. The defendant maintains that defense counsel’s criticism of elected officials and comments on matters of public concern like expenditure of public funds is protected political speech. In support, the defendant cites Gentile v. State Bar of Nevada, 501 U.S. 1030, 1043, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (“A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.”) (emphasis added). According to the defendant, the order’s sole exception for statements about procedural matters is insufficient to render it narrowly tailored. The defendant also contends that the trial court should have considered the less restrictive alternative of allowing individual voir dire on jurors’ exposure to media coverage, as the court did at the second trial.
On the defendant’s third argument, she contends that the trial court’s order is prone to discriminatory enforcement, as seen in the trial court’s rulings on her post-order motions directed toward the State. According to the defendant, because the order does not completely incorporate Rule 4-3.6, including subsection (b) which applies to third-party agents of counsel, the order completely restrains the defendant’s speech while allowing the State’s agents to say whatever they wish. For example, the defendant argues, the trial court allowed the Boynton Beach Police Department to continue publishing videos which threaten her right to a fair trial, *240 while ordering defense counsel to stand mute. According to the defendant, she should' not -be forced to waive her right against self-incrimination in order to respond. See Gentile, 501 U.S. at 1056, 111 S.Ct. 2720. The defendant also contends that defense counsel’s comments were permissible because they were made in response to, and designed to counter, the prejudicial media environment which the State created. In support, the defendant cites the comment to an ABA model rule recognizing that counsel has the right to reply with extrajudicial statements when “they are made in response to statements made publicly by another party, .., where a reasonable lawyer would believe a public response is required in order to avoid prejudice to the lawyer’s client.” Model Rules of Prof'l Conduct r. 3.6 cmt. [7] (Am. Bar Ass’n 2014).
6. The State’s Response
The State responds generally that the trial court’s order did not depart from the essential requirements of law or result in irreparable harm to the defendant.
On the defendant’s first argument, the State responds that the trial court’s order “took into consideration all of the proceedings in this case and all of the publicity this case has garnered.” The State argues the threat is imminent and substantial because the defendant’s case is set for trial, and any prejudicial comments to the media will affect the prospective jurors, as shown by the jury selection process in the previous trials. The State distinguishes Rodriguez on the grounds that, in Rodriguez, no showing of material prejudice existed, the order had no time or scope limitations, and counsel offered to curtail his comments as an alternative. Here, the State argues, defense counsel offered no alternative and indicated he would continue his media strategy. Similarly, the State distinguishes Aguamar on the.ground that, in Aguamar, the court entered an order enjoining counsel’s speech without the benefit of a hearing, unlike here where the trial court held a lengthy hearing.
On the defendant’s second argument, the State responds that the gag order is narrowly. tailored to apply to attorneys only, to exempt comments on procedural matters, and to expire upon the swearing of the jury. The State distinguishes Gentile on the'ground that, in Gentile, the lawyer whose disciplinary finding was reversed held one-préss 'conference six months before his client’s trial and merely stated that his client was a scapegoat. Here, the State argues, defense counsel’s' contacts with the media were much more frequent and substantial.

5. Our Standard of Review

 Appellate courts review orders prohibiting counsel from making extrajudicial statements by certiorari. Rodriguez, 734 So.2d at 1163; News-Press Pub. Co., Inc. v. Hayes, 493 So.2d 1, 1-2 (Fla. 2d DCA 1986). Alternatively, such orders may be reviewed by non-final appeal because they are .“in the nature of an injunction.” Rodriguez, 734 So.2d at 1163 n.1 (citing Fla. R. App. P. 9.130(a)(3)(B)); see also Aguamar, 33 So.3d at 841 (reviewing challenge to gag order as non-final appeal but also finding that order at issue was “a departure from the essential requirements of the law,” and citing Rodriguez).
Contrary to the State’s contention that the defendant failed .to make a threshold showing of irreparable harm, orders like the one in the instant case “implicate[ ] a violation of the parties’ constitutional rights which cannot be remedied on plenary review.” Rodriguez, 734 So.2d at 1163. Thus, in Gentile, the United States Supreme Court determined that a gag order can violate a lawyer’s First- Amendment rights when not properly balanced against *241 the State’s interest in ensuring a fair trial. Gentile, 501 U.S. at 1075, 111 S.Ct. 2720. However, the Court recognized that “the speech of lawyers representing clients in pending eases may be regulated under, a less demanding standard than that established for regulation of the press ....” Id. at 1074, 111 S.Ct. 2720; see also Fla. Freedom Newspapers, Inc. v. McCrary, 520 So.2d 32, 35 (Fla. 1988) (distinguishing between a. prohibition on an attorney’s comments and a prior restraint on the press).
Given the foregoing, a court must determine whether a restriction on extrajudicial statements is needed on “a case by case basis.” Rodriguez, 734 So.2d at 1164. And “the limitations imposed by the court on communications between the media and lawyers and/or litigants must be for good cause to assure fair trials.” Id.; see Aquamar, 33 So.3d at 841; see also State ex rel. Miami Herald Pub. Co. v. McIntosh, 340 So.2d 904, 910 (Fla. 1976) (setting forth the same standard of good cause and adding: “Muzzling lawyers who may wish to make public statements to gain public sentiment for their clients has long been recognized as within the court’s inherent power to control professional conduct.”).
To that end, Rule 4-3.6(a) of the Rules Regulating the Florida Bar provides:
A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood. of materially prejudicing an adjudicative proceeding due to its creation of an imminent and substantial detrimental effect on that proceeding.
R. Regulating Fla. Bar 4-3.6(a); see also The Florida Bar re: Amendments to Rules Regulating The Florida Bar, 644 So.2d 282, 283 (Fla. 1994) (incorporating into Rule 4-3.6 the “substantial likelihood of material prejudice” standard approved by the United States Supreme Court in Gentile).
With these standards of review in mind, we analyze the defendant’s three arguments in turn.

6. Our Analysis of the Defendant’s Three Arguments

a. The Defendant’s First Argument

On the defendant’s first argument, we conclude the trial court did not depart from the essential requirements of the law in finding that the State met it's evidentia-ry showing that a threat to a fair trial was imminent and substantial.
We reoognize that the State neither presented testimony nor formally sought to introduce exhibits such as defense counsels’ January 2017 press release into evidence. However, the press release was attached to the State’s motion for protective order, and the press release was extensively discussed among the parties at the hearing without objection. Other extrajudicial statements, such as numerous press conferences which defense counsel held, were discussed without objection as well.
Notably, the defendant does not dispute that defense counsel issued the January 2017 press release. Instead, the defendant argues the State did not prove that the media disseminated the press release, and she argues that her attorneys were permitted to issue the press release. However, Rule 4-3.6 requires only that the extrajudicial statement be one that “a reasonable person would expect to be disseminated by means of public communication.” (emphasis added.) A press release certainly satisfies this test.
Thus, on this record, the defendant has not shown it was improper for the trial court to consider defense counsels’ extraju *242 dicial statements in the press release. Furthermore, absent any objection, the trial court properly considered prior court proceedings and matters of record such as the defendant’s two prior trials, the media exposure experienced by prospective jurors in those trials, motions filed by the defense seeking a change of venue based on pretrial publicity, and prior court orders, including the February 2016 order to show cause directed at defense counsel for making prejudicial extrajudicial comments.
As a result, evidentiary support existed for the trial court’s order, and good cause for the trial court’s order was shown. See R.J. Reynolds Tobacco Co. v. Engle, 750 So.2d 781, 781-82 (Fla. 3d DCA 2000) (distinguishing Rodriguez and finding good cause for gag order based on the “record evidence” and the court’s “specific finding” that such an order was necessary).

b. The Defendant’s Second Argument

On the defendant’s second argument, we conclude the trial court did not depart from the essential requirements of the law in crafting the scope of the order, including the consideration of less restrictive alternatives.
The defendant is correct that a gag order must be narrowly tailored to achieve the objective sought, namely, a fair trial. Rodriguez, 734 So.2d at 1165. To determine whether a restraint on extrajudicial statements is narrowly tailored, courts look to whether less restrictive alternatives were considered and whether the subject order contains “any time or scope limitations.” Id. (noting “the absence of any time or scope limitations on the prohibited extra-judicial communications”); see also Aquamar, 33 So.3d at 841 (reversing gag order that was “unrestricted in scope and time limit”).
However, unlike counsel in Rodriguez, defense counsel here did not propose an alternative which was less restrictive than a gag order. Rodriguez, 734 So.2d at 1164 (“At the hearing, counsel for the petitioners offered to the court that no further advertisements would run and that petitioners would limit any future media communications .... ”). Here, defense counsel actually proposed the gag order as a less restrictive alternative to the revocation of his pro hac vice status, which would have resulted in his removal from the case.
Moreover, the trial court’s order permits counsel to make extrajudicial statements on matters not likely to prejudice the case such as procedural matters, and the speech prohibitions within the order expire upon the swearing of a jury. Accordingly, the order is narrowly tailored.

c. The Defendant’s Third Argument

On the defendant’s third argument, we conclude the trial court did not depart from the essential requirements of the law in balancing the viewpoints of the State and the defense. The trial court’s order, on its face, applies equally to counsel for the State and the defense (“All counsel in this case are prohibited .... ”). While the defendant argued the State violated the order through the actions of the Boynton Beach Police Department, the trial court cannot undo the prior publication of information like the police department’s videos on YouTube. In any event, the trial court’s order indicates that the court would be alert to any future attempt by the State to flout the order indirectly.

Conclusion

Based on the foregoing, we deny the defendant’s petition, because the trial court’s well-reasoned order does not depart from the essential requirements of the law. The order demonstrates that extrajudicial statements pose an imminent *243 and substantial threat to a fair trial; is narrowly tailored in both substance and duration; and is viewpoint neutral as it applies to extrajudicial comments by both parties’ counsel.

Petition denied.

Conner, J., concurs.
Warner, J., dissents with opinion.